Allen HARJO et al., Plaintiffs,

v.

Thomas S. KLEPPE et al., Defendants.

Civ. A. No. 74–189.

United States District Court,
District of Columbia.

Sept. 2, 1976.

Thomas E. Leubben, Jr., National Indian Youth Council, Albuquerque, N. M., Robert G. Vaughn, Institute for the Development of Indian Law, Washington, D. C., for plaintiffs.

Rembert A. Gaddy, Dept. of Justice, Scott Keep, Dept. of Interior, Washington, D. C., for defendants.

## OPINION AND ORDER

BRYANT, District Judge.

### I. INTRODUCTION

This matter is now before the Court on the parties' cross-motions for summary judgment. The parties have stipulated that no genuine issues of material fact exist. Plaintiffs in this action seek declaratory and injunctive relief against the policy and practice of the Interior Department in recognizing and dealing with defendant Cox, Principal Chief of the Creek Nation, as the sole embodiment of the Creek tribal government, and in refusing to recognize, facilitate, or deal with a Creek National Council as a coordinate branch of the tribal government responsible for certain legislative and financial functions.

The Creek Nation is one of the Five Civilized Tribes of Oklahoma. Each of the four plaintiffs is a resident of Oklahoma, a citizen of the United States, and a Creek Indian who is a citizen of the Muskogee (Creek) Nation and of a Creek Tribal Town. Each of the plaintiffs is a duly qualified elector under the laws or customs of his or her respective tribal town and under the laws of the Creek Nation, as to the election of tribal town representatives to the Creek national legislature. Each of the male plaintiffs is also a duly qualified elector under the original laws and 1867 Constitution of the Creek nation as to the election of the Principal Chief and Second Chief of that Nation. In addition, named plaintiff Allen Harjo is an elected representative of Fish Pond Tribal Town. Harjo has also

twice run unsuccessfully for Principal Chief of the Creek Nation.[1]

Defendants include the Secretary of the Interior and subordinate employees of the federal government with general responsibility for executing laws passed or approved by Congress relating to Indians. Defendants also include the Secretary of Treasury and a subordinate official with responsibility for executing the federal laws pertaining to revenue-sharing funds payable to Indian tribes. Defendant Claude A. Cox is sued in his capacity as the officially recognized Principal Chief of the Creek Nation. Cox was twice elected as Principal Chief pursuant to regulations and procedures devised under the October 22, 1970 Act of Congress, 84 Stat. 1091.[2]

Primarily at issue is the legitimacy of Cox's authority to disburse tribal funds and enter into contracts on behalf of the Creek Nation without the approval of the Creek National Council. Specifically, the first cause of action alleges: (1) Article I of the 1867 constitution of the Creek Nation lodges the lawmaking power of that Nation in the Creek National Council; (2) The Constitution of the Creek Nation places the financial affairs of the Nation exclusively under the control of the Creek National Council; (3) Congress, between 1866 and 1906, on several occasions specifically recognized the Creek National Council as the ultimate repository of power within the Creek national government; (4) Under the terms of the Act of 1906, 34 Stat. 137, and the Treaties of 1856 and 1866 Congress imposed on defendants the duty to respect and follow the provisions of the constitution of the Creek Nation; and (5) Federal defendants have approved the disbursement of tribal funds by defendant Cox on behalf of the Creek Nation and have paid federal funds to Cox contrary to the intent of Congress.[3]

Defendants argue that (1) This Court lacks jurisdiction over the action; (2) The action is a nonjusticiable controversy; (3) The Court should dismiss the action due to the absence of certain indispensable parties; (4) Various congressional acts have relieved the Creek Nation of sufficient authority that it has been rendered incompetent to handle the affairs of the tribe under the 1867 Constitution; (5) Congress was aware of the fact that the affairs of the Five Civilized Tribes (Creeks, Cherokees, Choctaws, Chickasaws, and Seminoles) were being administered by Principal Chiefs or Governors and therefore ratified this form of government when it enacted the Act of October 22, 1970, 84 Stat. 1091.

## II. PRELIMINARY ISSUES

### A. Jurisdiction and Justiciability

Defendants contend that the Court lacks jurisdiction over the subject matter of this action on the grounds that: (1) The question involved is political and not subject to the control of the judiciary; and (2) The issue involves an intratribal dispute which traditionally is not within the jurisdiction of the federal courts.

In making these arguments under the rubric of jurisdiction, defendants have failed to distinguish between judicial power (jurisdiction) and the appropriateness of the subject matter for judicial consideration

---

1. In the 1971 election Harjo received 1,846 votes, while Cox won with a plurality of 2,674. In the election of September 6, 1975 Allen Harjo received 1,792 votes to Cox's 1,840.

2. The Act of 1970, 84 Stat. 1091, provides for "popular selection" of the Principal Chief in accordance with procedures established by the officially recognized tribal spokesman and/or governing entity, and subject to approval of the Secretary of the Interior.

3. Plaintiffs' summary judgment motion is addressed solely to their first cause of action (the claim that defendants are acting beyond and contrary to their statutory authority). Defendants' cross-motion was addressed to all five of plaintiffs' causes of action. The parties have since stipulated that the Court resolve only the first cause of action at this time. The second and third causes of action generally allege that if the actions of defendants are authorized by statutes, those statutes are unconstitutional. Because of its disposition of the first cause of action, the Court need not reach those claims. The fourth and fifth causes of action are hereby dismissed, pursuant to stipulation of the parties. Oral argument was heard on the motions on April 1, 1976.

(justiciability). The Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), explained that distinction:

> "In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not 'arise under' the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III § 2), or is not a 'case or controversy' within the meaning of that section; or the cause is not one described by any jurisdictional statute." 369 U.S. at 198, 82 S.Ct. at 700.

■ Plaintiffs contend that defendants are acting beyond and contrary to the authority prescribed by Congress through various statutes. Thus the question clearly arises under the laws of the United States. Since among the matters governed by these statutes is federal defendants' authority to dispense and defendant Cox's authority to spend over $10,000 in revenue sharing funds and over $2 million in Indian claims appropriated by Congress, the amount in controversy requirement of 28 U.S.C. § 1331 is also satisfied. There is clearly a jurisdictional predicate for this action therefore.

■ With regard to the question of justiciability, defendants seem to misapprehend the nature of the nonjusticiable political question doctrine. The political question doctrine does not preclude the Court from resolving issues that may be otherwise properly raised, merely because the personal motivations of those raising the issues may be political in nature; the political question doctrine is rather basically a function of the separation of powers. The Supreme Court in *Baker v. Carr, supra,* articulated various indicia for recognizing when a case presents a political question best left to a different branch of government for resolution. These indicia include:

> " . . . a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. at 710.

■ The issues in this case do not fall within any of these formulations. The plaintiffs contend that defendants are acting contrary to and beyond their statutory authority. There is certainly no textually demonstrable constitutional commitment of issues involving statutory interpretation to a coordinate branch of government. While Congress has the power to regulate commerce with Indian tribes and based on that authority delegates certain duties to executive departments, it remains to the Courts to interpret such statutes. Similarly, there is no lack of judicially discoverable and manageable standards here; the Court employs ordinary principles of statutory construction in resolving the issue of interpretation, while fashioning relief within its equitable powers. Nor does the interpretation of statutes require an initial policy determination for nonjudicial discretion, demonstrate a lack of respect for a coordinate branch of government, ignore any unusual need for adherence to a political decision, or present any potential for multifarious pronouncements. While review of statutes spanning over 100 years may be arduous, it is clearly, even uniquely, a judicial task. Indeed, in *Baker v. Carr, supra,* the Supreme Court stated that application of the political question doctrine to Indian questions is "limited and precise". *Baker v.*

*Carr, supra,* at 215, n. 43, 82 S.Ct. 691. The Supreme Court explained that while the *status* of an Indian tribe *qua* Indians is usually considered a matter for political departments, even that determination might be left to the Court if Congress acts arbitrarily. For the courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power". *Id.* at 217, 82 S.Ct. at 710. Therefore, while the question of what constitutes an Indian tribe is not ordinarily a matter for determination by the courts, the courts have always resolved questions of legislative intent even when the questions deal with Indians. See, *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, at 664 (D.Maine, 1975), aff'd, 528 F.2d 370 (C.A.1, 1975).

### B. Intra-Tribal Dispute

■ Defendants also maintain that the Court lacks "jurisdiction" over this case because it constitutes what defendants characterize as an "intra-tribal dispute". Defendants rely primarily on this Tenth Circuit doctrine, established in *Martinez v. Southern Ute Tribe of Southern Ute Reservation,* 249 F.2d 915 (1957); *Motah v. United States,* 402 F.2d 1 (1968), and *Prairie Band of Pottawatomie Tribe of Indians v. Udall,* 355 F.2d 364 (1966), in arguing that the instant dispute is essentially a factional split within the tribe and should therefore be dismissed. While factional rivalries do appear to have played a significant part in motivating plaintiffs to file the suit, the only relevant question for the Court, as indeed the above cases recognize, is whether the *issues* raised by plaintiffs are internal tribal issues or whether they arise under the constitution of laws of the United States. In each of those cases the courts determined that the controversy was one internal to the tribe and over which the tribal governing body had exclusive authority. In sharp contrast, this case questions not the propriety of tribal actions, but the legality of actions of federal officials pursuant to federal statutes. The issue is not who is entitled to membership in the tribe or to vote in tribal elections, but whether the Secretary has acted lawfully in refusing to permit the Creek National Council to participate in the determination of the uses to which tribal funds will be put and other tribal matters. In sum, the Court perceives no relevance of the "intra-tribal dispute" doctrine to the circumstances of this case, nor any other reason why this controversy is inappropriate for resolution by federal judicial power.

### C. Indispensable Parties

Defendants argue that the Court must dismiss this action because of the absence of three indispensable parties to the suit. The allegedly indispensable parties are the three Creek "tribal towns" which have chosen to organize under the provisions of the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. § 503, which provides in relevant part:

" . . . any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe. The Secretary of the Interior may issue to any such organized group a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting. * * * Such charter may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under sections 476 and 477 of this title. * * * "

■ In general indispensable parties are those persons who not only have a direct and tangible interest in the controversy, but also whose interest would necessarily be affected in such a way by the judgment that it would be inequitable to proceed without them. See generally *Shields v. Barrow,* 58 U.S. (17 How.) 130, 15 L.Ed. 158 (1854); 3A Moore's Federal Practice ¶ 19.07 *et seq.* Defendants maintain that these

three towns would be "affected" in the following ways: (1) female members of the towns would not be permitted to vote for the Principal Chief; (2) membership in the towns as they now exist may well be lost if the plaintiffs prevail; and (3) the towns' relationship with the federal government would be altered if plaintiffs prevail.

■ These contentions are without merit. As to the first, as plaintiffs point out, the towns as corporate bodies are wholly unaffected by whatever provisions Creek law may make for voting in Creek national elections. Should plaintiffs prevail here, requiring elections for a Second Chief or a National Council, the determination of those eligible to vote will be made pursuant to Creek law as modified by federal law; the three tribal towns as corporate bodies are simply not involved in that question. Nor would recognition of the 1867 Creek constitution, as modified by federal law, as the current basis of Creek national government affect membership in the tribal towns. The Creek Nation has always been a confederacy of tribal towns, and the 1867 Creek constitution contains no membership provision. Nothing in this Court's decree, should plaintiffs prevail, would have any effect on the traditional power of tribal towns to determine membership criteria.[4] Finally, the Court perceives no way in which the relationship of these three tribal towns with the federal government will be disturbed by a recognition of the 1867 constitution, as modified, as the governing structure of the Creek Nation. If plaintiffs prevail, there will be no increase or decrease in the quantum or nature of sovereignty exercised by the Creek national government over the tribal towns; rather, some of the decisions (primarily fiscal) that are now made solely by the Principal Chief would then be made by the National Council. And whatever relationship these three towns now have with the federal government by virtue of their incorporation under the 1936 Act is independent of their role under the 1867 constitution, and—being statutorily based—will not be affected by the decree in this case. The Court therefore holds that these tribal towns are not necessary or indispensable parties to this case.[5]

## III. THE MERITS

■ The central issue to be resolved in this case is whether the tribal government of the Creek Nation has survived statutory dismemberment, and if so, whether the federal government is acting legally in recognizing the Principal Chief as the sole embodiment of that government. Phrased differently, the question is whether the federal government may permit funds belonging to the Creek Nation to be expended solely on the authority of the Principal Chief, or whether Creek and federal law require the participation of the Creek National Council in the tribe's financial decision-making. After extensive investigation and careful consideration, aided by the able written and oral presentations of counsel, the Court has arrived at the inescapable conclusion that despite the general intentions of the Congress of the late nineteenth and early twentieth centuries to ultimately terminate the tribal government of the Creeks, and despite an elaborate statutory scheme implementing numerous intermediate steps toward that end, the final dissolution of the Creek tribal government created by the Creek Constitution of 1867 was never statutorily accomplished, and indeed that government was instead explicitly perpetuated.

More than is sometimes the case, the legal analysis necessary to unravel the statutory tangle present here is inextricably

4. See, Opler, "The Creek Indian Towns of Oklahoma in 1937", *Papers In Anthology,* Vol. 13, No. 1, Spring 1972 (Exhibit 4 To Plaintiffs' Memorandum In Support of Summary Judgment Motion); See generally, Angie Debo, *And Still The Waters Run* (Gordian Press, Inc., 1966), p. 9; Angie Debo, *The Road to Disappearance* (Univ. of Oklahoma Press, 1941), pp. 311–314.

5. It should be noted that while all three towns have been aware of this litigation since its inception, none has sought to intervene in the case.

bound up with the social, political, and economic history of the times from which the legislation emerged. While the Court can offer only the briefest of synopses in this opinion, it must be emphasized that an accurate perception of the matters discussed herein is heavily dependent upon at least a perusal of the sources cited in this opinion.[6]

As a result of the increasingly substantial expansionist pressures from the white population, the federal government in the 1820's adopted a policy of forcible removal of the culturally advanced Creeks from the southeastern United States.[7] This policy, expressed in the Indian Removal Act of 1830,[8] eventually resulted in the relocation of the Creek, Cherokee, Seminole, Choctaw and Chickasaw tribes to what is presently the state of Oklahoma. Among the rights granted to the Creeks by the Removal Treaty of March 24, 1832 was the right to perpetual self-government of their new lands.[9] Because of their cultural and political sophistication relative to other Plains Indians, the Indians who had been removed from east of the Mississippi to the Oklahoma area became known as the Five Civilized Tribes. Prior to the Civil War, these tribes owned all of the present state of Oklahoma except the panhandle region.[10] As a penalty for their alliances with the Confederacy during the Civil War, the tribes were compelled to cede to the federal government the western half of their lands. The remaining lands occupied by the Five Civilized Tribes continued to be known as the Indian Territory.[11]

Two treaties were signed by the Creeks and the federal government during this period. In the treaty of August 7, 1856, 11 Stat. 699, Congress ratified once more a guarantee of Creek self-government. Article XV of that Treaty provided:

"So far as may be compatible with the constitution of the United States, and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self-government and full jurisdiction over persons and property, within their respective limits . . . ."

The treaty recognized the existence of a Creek Council, power of the Council to make laws, and authority of the Treasurer to receive and disburse funds. 11 Stat. 699, 700, 701, 702, 706.

The 1866 Treaty, 14 Stat. 785, specifically reaffirmed previous treaty obligations (including those of the 1856 treaty) not inconsistent with the new treaty. Article X of the treaty provided:

"The Creeks agree to such legislation as Congress and the President of the United States may deem necessary for the better administration of justice and the protection of the rights of persons and property within the Indian territory: *Provided, however,* said legislation shall not in any manner interfere with ̄ or annul their present tribal organization, rights, laws, privileges and customs."

The treaty ceded to the United States the western half of the Indian domain, about

---

**6.** The materials upon which the Court has chiefly relied with respect to the history of the periods involved in this case include the two books (cited above in note 4) by Angie Debo, *And Still The Waters Run* and *The Road to Disappearance,* which appear to be the pre-eminent works in the field and which were used by the Court pursuant to the agreement of the parties; *University of California Publications in History,* Vol. 6: "The Formation Of The State Of Oklahoma", by Roy Gittinger (University of California Press, 1917) [hereinafter, "Gittinger"]; the *Congressional Record* for the periods during which the Acts of 1898, 1901, and 1906 were being debated; and the exhibits furnished by counsel and filed as part of the record in this case.

**7.** For a history of the Creeks in the colonial and revolutionary period, see Corkran, *The Creek Frontier,* University of Oklahoma Press (1967).

**8.** See also *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 622–626, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

**9.** Debo, *The Road To Disappearance,* p. 99.

**10.** For a history of the tribes during the pre-Civil War period, see Foreman, *The Five Civilized Tribes,* University of Oklahoma Press (1934).

**11.** *Id.*

3,250,560 acres, for $975,168, and was in general highly disadvantageous to the Creeks.[12] A few days after ratification of the treaty by the U. S. Senate, Congress granted franchises to two railroads to cross the Indian Territory. The more important one of these for present purposes granted the right of way across the Territory from Kansas to Texas with alternate sections in a twenty-mile strip "whenever the Indian title shall be extinguished by treaty or otherwise . . . *Provided,* That said lands become a part of the public lands of the United States." [13] This grant was to play an important role in the later enactment of a provision crucial to the outcome of this suit.

No further treaties were signed between the Creeks and the federal government. On October 12, 1867, the Creeks adopted a constitution and a code of laws for the "Muskogee Nation". The constitution was modeled on American federalism, with executive, legislative, and judicial branches. Legislative power was lodged in a National Council, a bi-cameral body in which each tribal town or "Talwa" was entitled to one delegate in the House of Kings and one in the House of Warriors, plus an additional delegate in the House of Warriors for every two hundred people. The members of the Council were elected for four year terms.

Executive power of the Creek Nation was delegated to the Principal Chief, elected by universal adult male suffrage for a term of four years. The constitution also provided for a Second Chief, similarly elected, to succeed the Principal Chief upon his death, resignation, or impeachment. The Principal Chief was given the power and responsibility *inter alia* to reprieve and pardon criminals, execute and enforce the laws, make an annual report to the National Council concerning the state of the nation, and approve or veto laws enacted and measures taken by the Council.

Article V of the constitution provides for a Treasurer of the Creek Nation, to be selected by the Council for a four year term, who is given the authority to receive funds and to "disburse the same as shall be provided by law." The Treasurer is to report at least yearly to the Council on the financial affairs of the nation. The constitution and laws provided that the National Council had initial responsibility for financial affairs, including making determinations as to the purposes for which Creek funds were to be spent. It also provided that the Principal Chief had the power of veto over such measures, a veto which could be overriden by a two-thirds vote of each House of the National Council. Once a spending measure received final approval, the Treasurer was to perform any necessary accounting and disbursing functions.[14]

The constitution also created a court system, whose jurisdiction was limited to Creek citizens. The nation was divided into six districts; each had a judge elected by the Council. The district court tried all criminal cases and minor civil cases, and trial by jury was provided. There was a Supreme Court of five justices chosen by the Council for four year terms, which tried all civil cases where the amount in controversy exceeded one hundred dollars.[15]

Generally speaking, the Creek Nation prospered during the final third of the nineteenth century. According to ancient Indian custom, all land was held by the tribe communally. Any citizen could cultivate as much land as he wanted, and when he ceased to work that land it reverted to the Nation.[16] By 1890 however ranching had made serious inroads on the character of Creek country. Under various Creek laws, members of the tribe were able to obtain leases of land to be fenced in for grazing

12. *Id.*

13. 14 Stat. 236, 237–239, 294.

14. *Constitution and Laws of the Muskogee Nation* as compiled and codified by A. P. McKellop, Muskogee, Indian Territory (1893). The

parties agree that this was in fact the distribution of authority and functions under the 1867 Constitution.

15. Debo, *The Road To Disappearance,* p. 181.

16. Debo, *And Still The Waters Run,* p. 14.

purposes; by 1896 about one-third of Creek lands were so held.[17] Most of the land under lease was then sub-leased to cattle interests (often from Texas) at a large profit.

Also during this period the number of white persons living in the Indian Territory grew dramatically; numerous white towns appeared throughout the Territory. The white settlers were engaged in both farming and cattle raising, and despite the repeated pleas of the Creeks that the federal government remove the vast numbers of whites living illegally on Creek lands, the government failed to honor its obligations and the number of whites continued to grow.[18] One of the recurrent problems in the relations between the Creeks and the whites at this time was the general absence of an adequate court system to deal with criminal and civil disputes. The Creek courts had no jurisdiction over whites, and federal courts in the area were created very slowly. Crime flourished, and the payment of debts was unenforceable. Finally, in 1895, federal courts with civil and criminal jurisdiction over United States citizens and over tribal citizens in mixed cases involving U.S. citizens were created for three judicial districts comprising the Indian Territory. The laws of Arkansas were designated to govern actions in these federal courts, in the absence of a federal statute.[19] The authority of the tribal courts was further and fatally undermined two years later when, in the Appropriations Act of June 7, 1897, 30 Stat. 62, Congress extended the reach of the federal (and the incorporated Arkansas) law to cover all persons, including Indians, in the Territory, effective January 1, 1898.[20] The transition to federal law as the governing body of civil and criminal law was completed the following year by the Curtis Act, discussed below, which rendered tribal law unenforceable in the federal courts (§ 26) and, after allowing time for the completion of a portion of the cases then pending in the tribal courts, abolished the tribal courts and transferred the remaining cases to the federal courts (§ 28).

As might be expected, the white settlers were not happy with their inability to exercise any political control over the Indian Territory in which they lived, with their inability to get title to communally held Indian lands,[21] and in general with the restrictions on their ability to mold their environment to their liking. As their numbers grew, so too did their demand that the communal tenure and tribal governments be abolished in favor of both individual tenure in which the lands could pass freely into white hands and the political reorganization of the Territory into a state. Proposals for forced allotment of Indian lands were not new; since the end of the Civil War many bills seeking the abolition of tribal tenure had been introduced into Congress.[22] By 1890, when the Oklahoma Territory adjacent to the Indian Territory was opened and a territorial government created, the clamor for allotment had reached a new peak. All the federal agencies responsible for Indian affairs were advising Congress of the need to change the current system.[23] The leading congressional proponent of allotment and assimilation was Senator Henry L. Dawes of Massachusetts. At his instance, the Congress in 1887 passed the Dawes Severalty Act, 24 Stat. 388, providing for allotments on Indian reservations with the remaining unalloted lands on those reservations to be purchased by the govern-

---

**17.** *Id.* at 15.

**18.** Debo, *The Road To Disappearance,* pp. 316–318; See also Gittinger, *op cit.,* pp. 98–188.

**19.** Debo, *And Still The Waters Run,* pp. 18–19, Debo, *The Road To Disappearance,* pp. 326–329.

**20.** It should be noted that Congress did not intend here to divest the National Council's power to legislate; indeed, the act specifically provided that such legislation was to be transmitted to the President after its enactment for his approval or veto.

**21.** See, e. g., *Choate v. Trapp,* 224 U.S. 665, 667, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

**22.** Debo, *And Still The Waters Run,* p. 20.

**23.** *Id.* at pp. 20–23.

ment and thrown open to homesteading. The Five Civilized Tribes were exempted from the Act's provisions, but regarded it as handwriting on the wall.

The next blow fell on March 3, 1893, when Congress created a commission to negotiate with the Five Tribes for the extinction of their communal titles and the eventual creation of a state. 27 Stat. 612, 645. The Commission was headed by Henry Dawes, who by then had retired from the Senate, and it became known as the Dawes Commission. During the next several years the Commission attempted to negotiate the dissolution of the tribes, but had minimal success; as a result they continued to report to Congress and to the public of what they regarded as the pressing need for dissolution of the tribes and allotment of the land.[24] By 1895, the tribes still refused to deal with the Dawes Commission. In that year Congress responded by authorizing a survey of all the Indian land, and in 1896 directed the Commission to make a complete roll of the members of each tribe.[25] Bills were also introduced in Congress each year calling for the forcible abolition of tribal status. In the 1897 Appropriations Act (30 Stat. 62), Congress began to force the issue by subjecting all laws passed by the National Council to Presidential veto, with the significant exceptions of resolutions of adjournment and acts relating to negotiations with the Dawes Commission. As a result of all this pressure, and apparently preferring a negotiated settlement to an imposed one, the tribes began to deal with the Commission.[26] By 1898 all five tribes had drawn up compacts with the Commission, and the Seminole Agreement had even been ratified. It appeared likely, however, that the other agreements would not be ratified by the tribes' membership, and on June 28, 1898 Congress enacted the Curtis Act, which provided for forced allotments and the eventual termination of the

tribal tenure without the Indians' consent.[27] The Act incorporated the provisions of the tentative agreements with each of the four remaining tribes, providing that if the agreement with any tribe was ratified by the tribe the provisions of the agreement would substitute for the more drastic allotment provisions of the Act. The Creeks did in fact reject their agreement, and the Act went into effect in their country.

■ The Curtis Act, 30 Stat. 495, is the first of the four pieces of federal legislation critical to the resolution of this suit. In general, the Act provided for compulsory allotment of tribal lands to those determined by the Dawes Commission to be entitled to a place on the final rolls of the tribe (§ 11); ratified an 1895 decision of a federal territorial court that towns in the Territory had the right to establish municipal governments under sections of the Arkansas statutes placed in effect by the court act of 1890[28] (§ 14); made the civil law of the tribe unenforceable in the federal courts while abolishing the tribal courts (§§ 26, 28); and made various other provisions to facilitate the allotment process and assumption of control of the Territory by the increasingly numerous white settlers.

The feature of the Act most relevant to the question of continuing tribal governmental power is section 19, which provided:

"That no payment of any moneys on any account whatever shall hereafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation."

24. *Id.* at pp. 23–27; Debo, *The Road To Disappearance,* pp. 346–348.

25. Debo, *And Still The Waters Run,* p. 32; Debo, *The Road To Disappearance,* pp. 368–369.

26. Debo, *The Road To Disappearance,* p. 369.

27. Debo, *And Still The Waters Run,* pp. 32–33.

28. Debo, *The Road To Disappearance,* p. 364.

While there is apparently no explanatory legislative history to assist in illuminating the ultimate purpose of this section, it is quite clear that Congress did not intend it as a limitation upon the constitutional power of the Creek government to allocate and spend tribal funds. It was, rather, a limited device intended to prevent any possible illegitimate diversion or embezzlement of the payments to be made to individual members of the tribes under the allotment programs and the general distribution of the value of tribal property rights.[29] If the section had any impact at all on the authority of Creek government, it was only to eliminate the function of the Treasurer in the actual disbursement of such moneys. This construction is confirmed by the very few judicial interpretations that section 19 has received. In *Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), the Supreme Court was faced with the question of whether certain payments which had been made by the U. S. government violated the section. The Court reasoned:

"The text of that section and its legislative history demonstrate that it prohibits only payments to tribal officers which are 'for disbursement'—*i. e.,* payments to be distributed by them to members of the tribe. If the first clause of Section 19 is construed as prohibiting all payments to the tribe or its officers, then the later clauses, providing only for payments to members and per capita payments, are inadequate to dispose of the problems raised by the first clause. For then no provision is made for the expenses of maintaining and conducting the tribal government, despite the fact that the Seminole tribal government was not only to continue after the Curtis Act but was in fact relieved of the necessity of secur-

ing Presidential approval of its legislation[30] by an agreement ratified three days after the passage of that statute. See 30 Stat. 567, 569. Section 19, as originally introduced in the House, provided that payments of 'all expenses incurred in transacting their business' were to be made under the direction of the Secretary of the Interior.[31] The deletion of this clause is persuasive that *Congress intended that tribal officers should retain the right to disburse their funds for the expenses of their respective tribal governments. For these reasons we think Section 19 prohibits payment by the Government to the tribal treasurer only when such payments are to be distributed by him to members of the tribe. It has no application to money earmarked for educational or tribal purposes, and money intended for any purpose the tribe may designate.* (emphasis added). 316 U.S. at 302–303, 62 S.Ct. at 1057.

The section received a similar construction in *Choctaw Nation v. United States,* 91 Ct.Cl. 320 (1940), *cert. denied,* 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941), where the Court held that

". . . section 19 of the Curtis Act related only to moneys intended for disbursement per capita or for the purpose of carrying out agreements or acts of Congress concerning matters over which jurisdiction was taken from the tribal government and vested in the Secretary of the Interior when the authority of such tribal government was restricted and, as so limited, continued by . . . subsequent acts of Congress . . . We think the words 'all sums' as used in the second clause of the section relate to the same 'moneys' mentioned in the first. The words 'payments * * * to members of said tribes' as used in the second

---

**29.** As a result of the incessant allegations by the Dawes Commission and other federal agencies of pervasive corruption and venality on the part of many tribal officials, there was a widespread perception in Congress that no tribal officials could be trusted to make these payments. For examples of the allegations and the perception, see *Stephens v. Cherokee Nation,* 174 U.S. 445, 450–460, 19 S.Ct. 722, 43 L.Ed.

1041 (1899); *Seminole Nation v. United States,* 316 U.S. 286, 298–300, 304–305, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); Gittinger, *op. cit.,* pp. 189–190; for a contrasting view, see Debo, *And Still The Waters Run,* pp. 23–25.

**30.** Footnote renumbered and omitted.

**31.** Footnote renumbered and omitted.

clause has the same meaning as the word 'disbursement' in the first clause. In other words, it appears that the restriction against payments intended for disbursement in the first clause is expressly carried over and rephrased in the second clause. For this reason we think the first clause was intended to change the method of 'making payments of all sums to members of said tribes;' and that the second clause was intended to supply a new method and directed that 'payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed by him' " 91 Ct.Cl. at 392.[32]

■ In summary, then, it is clear that with the passage of the Curtis Act, the territorial sovereignty of the Creek Nation had been seriously eroded. Territorial sovereignty, however, is not the issue in this case; the issue here is much narrower. The relevant question is whether or not the tribal government of the Creeks had been stripped of its power to deal with *tribal* affairs as such. While the tribe had clearly lost much of its authority in a territorial sense, or in the sense that a state has sovereignty, it is equally clear that the tribal government remained authoritative—in legal contemplation—as to matters of tribal organization and management, including control of tribal funds.

The provisions of the Curtis Act were so drastic from the Creek point of view that they soon consented to a new agreement to supersede the one contained in section 30 of that Act but rejected by the tribe. The new agreement was ratified by the tribe, and by the Congress in the Act of March 1, 1901, 31 Stat. 861. A number of the agreement's provisions bear on the issues before the Court. First, the agreement provided for the actual dissolution of the tribal government (§ 46) within about five years, by which time it was expected that the tribal affairs would have been wound up:

> "46. The tribal government of the Creek Nation shall not continue longer than March fourth, nineteen hundred and six, subject to such further legislation as Congress may deem proper."

The agreement recognized, however, that until such time as the Creek national government was in fact dissolved, it would continue to function under the 1867 Constitution, as modified by this act and prior agreements. Section 42 of the agreement recognized specifically the legislative and financial powers of the National Council, and continued the requirement that such legislation be subject to Presidential veto.[33]

32. This holding must be taken as an overruling of the statement made earlier by the Court of Claims in *Creek Nation v. United States,* 78 Ct.Cl. 474, 489–490 (1933) that Congress intended *in § 19* to invest the Secretary "with authority to disburse and expend the funds in such manner and for such purposes as would, in his judgment, satisfy the needs of the Creek Nation and promote the welfare and happiness of its citizens, subject to such limitations as Congress might subsequently impose", since the section cannot both grant the Secretary discretion to spend money as he judges best and at the same time relate solely to payments to tribal members. In any case, the earlier statement was conclusively overruled by the interpretation placed on § 19 by the Supreme Court in *Seminole Nation v. United States, supra.* The Court is unable to reconcile the passage quoted in the text immediately above (from 91 Ct.Cl. at 392) with the Court of Claims' earlier reliance in that case, *id.* at 376, on the language (quoted in this note) from the *Creek Nation* case, except to view that reliance as a reading of the *Creek Nation* language as being based upon the effect of the Curtis Act as a whole, rather than solely upon § 19. In any event, this Court is bound in the instant case by the holding of the Supreme Court, which is in fact also the conclusion supported by the available historical evidence.

33. "42. No act, ordinance, or resolution of the national council of the Creek Nation in any manner affecting the lands of the tribe, or of individuals after allotment, or the moneys or other property of the tribe, or of the citizens thereof, except appropriations for the necessary incidental and salaried expenses of the Creek government as herein limited, shall be of any validity until approved by the President of the United States. When any such act, ordinance, or resolution shall be passed by said council and approved by the principal chief, a true and correct copy thereof, duly certified, shall be immediately transmitted to the President, who shall, within thirty days after received by him, approve or disapprove the same. If disapproved, it shall be so indorsed and returned to the principal chief; if approved, the approval shall be indorsed thereon, and it shall

Moreover, it recognized that these functions were performed pursuant to the 1867 Creek Constitution in the requirement that the agreement be ratified by the National Council "as provided in the constitution of said nation." 31 Stat. 861.

▆▆▆ The agreement and act did not place any further limits on the power of the National Council to make, and the principal chief to approve, decisions with respect to tribal finances. Like the Curtis Act, however, the agreement did provide for control of the Secretary of the Interior over disbursements and cash flow arising out of the implementation of the agreement. Section 31 provided that moneys payable to the tribe under the agreement were to be deposited to their credit in the U. S. Treasury, with an itemized monthly report going to the Principal Chief. Section 32 roughly corresponded to section 19 of the Curtis Act, and provided:

"32. All funds of the tribe, and all moneys accruing under the provisions of this agreement, when needed for the purposes of equalizing allotments or for any other purposes herein prescribed, shall be paid out under the direction of the Secretary of the Interior; and when required for per capita payments, if any, shall be paid out directly to each individual by a bonded officer of the United States, under direction of the Secretary of the Interior, without unnecessary delay."

By its terms, section 32 applied only to payments needed for equalization of allot-ments,[34] per capita payments, or for other expenditures arising from the agreement itself.[35] Finally, the act and agreement explicitly reasserted the continuing authority of the National Council in controlling the use of any tribal funds not expended under the agreement:

"33. No funds belonging to said tribe shall hereafter be used or paid out for any purposes by any officer of the United States without consent of the tribe, expressly given through its national council, except as herein provided."

The agreement also interacted with the Creek government's executive branch in two primary ways. First, the act's allotment scheme provided for commissions to carry out the appraisal and allotment of land, and the sale of town lots. The Principal Chief was to appoint certain members of the commissions or committees, and if he failed or refused to do so the Secretary was directed to make the appointments (§§ 2, 10). Secondly, the deeds conveying the individual allotments to members of the tribe were to be signed and delivered by the Principal Chief on forms provided by the Secretary. The conveyances were required to be approved by the Secretary before becoming final (§ 23). In sum, then, under the agreement the Creek government through its National Council retained its general authority for dealing with tribal affairs,[36] and for determining the purposes for which tribal funds would be spent, ex-

be published in at least two newspapers having a bona fide circulation in the Creek Nation."

**34.** Section 9 provided that after allotments had been made, any residual lands and any funds arising under the agreement should be used for equalizing the value of the allotments in the hands of the allottees. It also provided that other tribal funds should be used if funds provided for in the agreement proved insufficient. Among the funds made available under the agreement (§ 27) for equalization purposes were any treaty funds of the tribe, e. g. any funds remaining on deposit in the U.S. Treasury which belonged to the tribe by virtue of the Treaty of 1866. See, Debo, *The Road To Disappearance*, p. 174; cf. *Choctaw Nation Of Indians v. United States*, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943); *Quick Bear v. Leupp*, 210 U.S. 50, 80, 28 S.Ct. 690, 52 L.Ed. 954 (1908).

**35.** E. g. § 40, for education of Creek citizens (the section also stipulated that such funds were to be appropriated by the National Council, and that the Secretary could only spend Creek funds for educational purposes on his own initiative if the Council refused to make the appropriation).

**36.** Section 44 explicitly reconfirms the binding effect of prior treaties, except to the extent that they are inconsistent with the agreement. This of course includes treaties guaranteeing the Creeks the maximum self-government consistent with Congressional objectives. Treaty of 1856, 11 Stat. 699.

cept to the extent those funds were needed for equalization of allotments or for other expenditures resulting from the act.[37]

During the next few years, the federal government continued to reorganize the Indian Territory in anticipation of imminent statehood. The enrollment and allotment process moved slowly ahead, and townsites were surveyed and towns created and organized. Throughout this period, the federal officials and agents dominated the lives of the Five Civilized Tribes, using their control over tribal disbursements and resources to ensure that the administration of the Territory during that time conformed to the preferences, values, and priorities of the Interior Department.[38] As March 4, 1906—the date set for the dissolution of the tribal governments—approached, however, much remained to be done. The Interior Department, which had taken over the allotment process upon the expiration of the Dawes Commission on June 10, 1905, was still in the process of disposing of much tribal property, and it was apparent that the affairs of the tribes could not be wound up by the date set for the final dissolution of the tribes. Indeed, there was still considerable resistance to the allotment program itself among the tribal members, particularly the fullbloods.[39] The tribal rolls had not been completed, and there was considerable dispute over the question of whether allotments should carry restrictions on alienation. In order to finally address these and other issues, the Congress in early 1906 debated and enacted the "Five Tribes Act", 34 Stat. 137 (April 26, 1906); this act was the last to deal comprehensively with the affairs of the tribes.

Several sections of the Five Tribes Act are relevant to the scope of the surviving authority of the Creek national government and National Council. Section 2 continued the authority of the Secretary of the Interior to disburse Creek funds for the equalization of allotments, as provided by section 9 of the 1901 agreement. In order to ensure that the conveyance of allotments would not be interrupted by the refusal [40] of any Principal Chief to perform his duties (required by section 23 of the 1901 agreement) of signing and delivering deeds, section 6 of the act provided:

"Sec. 6. That if the principal chief of the . . . Creek . . . tribe shall refuse or neglect to perform the duties devolving upon him, he may be removed from office by the President of the United States, or if any such executive become[s] permanently disabled, the office may be declared vacant by the President of the United States, who may fill any vacancy arising from *removal, disability* or *death* of the incumbent, by appointment of a citizen by blood of the tribe."

"If any such executive shall fail, refuse or neglect, for thirty days after notice that any instrument is ready for his signature, to appear at a place to be designated by the Secretary of the Interior and execute the same, such instrument may be approved by the Secretary of the Interior without such execution, and when so approved and recorded shall convey legal title, and such approval shall be conclusive evidence that such executive or chief refused or neglected after notice to execute such instrument . . ." (emphasis added).

37. The agreement was amended in 1902, 32 Stat. 500, 503, to require that the Secretary pay out per capita to all Creek citizens any tribal funds not needed for equalization of allotments, upon the final dissolution of the tribal government of the Creek Nation (§ 44).

38. See, e. g., Debo, *And Still The Waters Run,* pp. 65–69.

39. See, e. g., *id.* at 53–58.

40. While Pleasant Porter, Principal Chief of the Creeks at the time of the passage of the act,

had cooperated with federal authorities in this regard, it was possible in view of the remaining opposition to the dissolution of the tribes that a chief might be elected who would refuse to sign the deeds, thus halting the conveyance of allotments. Porter's predecessor, Isparhecher, was one such possibility. See, Opler, "The Creek Indian Towns of Oklahoma In 1937", *Papers In Anthropology,* Vol. 13, No. 1, Spring 1972, pp. 46–49 (Exhibit 4 To Plaintiffs' Memorandum, note 6, supra).

■ It is important to note that this section empowers the President to fill the office of principal chief in only three limited circumstances: the removal, disability, or death of the incumbent. It is quite clear from the circumstances in which the provision was enacted and from its legislative history that it was intended by the Congress simply to ensure that the office whose occupant was charged by statute with signing the allotment deeds would at all times be filled, and not to deprive the tribes of the right to continue electing their Principal Chiefs—under ordinary circumstances— as long as their tribal governments continued to exist.[41] Apart from the specified occurrences, the section provided no warrant or authority for Presidential appointment of a Principal Chief.[42]

The act also dealt in limited ways with the authority of the Creek Nation over its financial affairs. Section 10 in effect ratified the Secretary's earlier seizure of control over the tribal schools,[43] directing that he run those schools until such time as either a Territorial or State school system was established which adequately provided for the education of Indian children. The section also limited the amount of tribal funds the Secretary could spend on the schools in any one year to that amount spent for the school year ending June 30, 1905.

■ Section 11 of the act provided as follows:

"Sec. 11. That all revenues of whatever character accruing to the . . . tribes, whether before or after dissolution of the tribal governments, shall, after the approval hereof, be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be pre-

**41.** As originally drafted by the Department of the Interior, see *Congressional Record,* 59th Cong., 1st Sess., p. 1242 (Jan. 18, 1906), and approved by the House Committee, H. Rep't 183, 59th Cong., 1st Sess., p. 2, section 6 contemplated the continuance of the titular office of Principal Chief after the dissolution of the tribal government for the purpose of signing deeds and patents as required by the 1901 agreement. As reported to the House by the committee, the section would have provided in relevant part:

"Sec. 6. That the principal chiefs of the Choctaw, Cherokee, Creek, and Seminole tribes, and the governor of the Chickasaw tribe, recognized by the Secretary of the Interior at the time of the dissolution of the tribal governments, are hereby continued in office for the purpose of executing patents, deeds, and other conveyances affecting lands belonging to said tribes, respectively, and to represent the tribes in such matters as may be referred to them by the Secretary of the Interior . . ." *Congressional Record,* op. cit., p. 1250.

The section as drafted also contained the removal and appointment provisions appearing in the law finally enacted, in essentially the same form. As noted in the text below, it was decided during the debate of the bill not to dissolve the tribal governments, and § 28 was added to the bill to assure their continuance; this obviously necessitated a major change in the quoted draft provisions, and that change resulted in the final form of the section. Without the change in the intent of Congress, the tribal government of the Creeks would have been dissolved, and the President would have had the authority to perpetuate a nominal Principal Chief through the appointment authority, since the constitutional election process would have been eliminated in the dissolution of the tribal government and its underlying constitution. Because however the government was not to be dissolved, the Congress intended the appointment authority of the section to be used only when a vacancy arose in the Principal Chief's office resulting from removal, disability, or death of the incumbent (without timely replacement by tribal constitutional processes). The section was not intended therefore to have any impact on the normal constitutional process of election of the Creek Principal Chief as long as the constitutional tribal government continued to exist.

**42.** Nor does the section provide the slightest support for the argument, made some years later by the Interior Department, that its real purpose and effect were to entirely supplant the Creek constitutional government and replace it with a "Principal Chief", serving at the pleasure of the President of the United States. As is clear from the legislative history discussed in note 41, *supra,* that result would only have been achieved by the Department had its original draft of section 6 survived the Congressional debates, which it did not. This legislative history makes quite clear that the combined effect of sections 6 and 28 as finally enacted was to continue indefinitely the Creek constitutional government and its underlying electoral processes.

**43.** See note 38, *supra.*

scribed by him; and he shall cause to be paid all lawful claims against said tribes which may have been contracted after July first, [1902], or for which warrants have been regularly issued, such payments to be made from any funds in the United States Treasury belonging to said tribes . . . *Provided,* That all taxes accruing under tribal laws or regulation of the Secretary of the Interior shall be abolished from and after [Dec. 31, 1905], but this provision shall not prevent the collection after that date nor after dissolution of the tribal government of all such taxes due up to and including [Dec. 31, 1905] . . .

> \* \* \* "

The legislative history of this section indicates that it was intended to establish a mechanism to ensure the collection of revenues accruing to the tribes after the contemplated dissolution of the tribal governments, when there would be no tribal officer authorized to do so.[44] The section had no effect on the tribes' authority to manage their financial affairs as long as the tribes were in existence; indeed, it implicitly confirmed that power by authorizing payment of tribal contracts and warrants. Also noteworthy is the recognition that until that time the tribes had retained the power of taxation; this provision, enacted at the urging of the white settlers in the Territory,[45] does in effect modify the Creek constitution by abolishing the functions of the National Treasurer. That section 11 intended to make no further modification in the Creek government during the remaining period of its existence (originally expected by the bill's drafters to be relatively brief) is demonstrated by the second paragraph of the section, which requires any tribal officer or member in possession of tribal property to turn such property over to the Secretary upon *dissolution* of the tribal government.

Two other sections of the act, both in contemplation of the period after the dissolution of the tribal governments, affected Creek financial affairs. In section 24, Congress provided that any expenses incident to the establishment of public highways in the territory of any tribe be paid from tribal funds by the Secretary. Secondly, the act directed, in section 17, that after the financial affairs of any tribe had been wound up by the sale of any unallotted land or other property and the payment of any outstanding obligations, the Secretary should pay any remaining tribal funds to the members of the tribe on a per capita basis. This provision obviously presumed a prior dissolution of the tribe, since the tribal financial affairs could not be finally wound up until the tribe ceased to exist and function as such. In addition, the provision applied only to tribal assets involved in the allotment and division process; any assets accruing to the tribe at a later time would not appear to be within the ambit of the section. This construction is consistent with the fact that at the time the bill was drafted it was expected that the tribes would cease to exist as of March 4, 1906.

As Congress debated H.R. 5976—which was to become the Five Tribes Act—in early 1906, it became apparent that it would be unable to complete legislative action on the bill before March 4th, the date set for tribal dissolution. There was great concern over the ramifications of tribal dissolution in the then-current state of affairs, particularly in regard to three problems. First, it was feared that if the tribal governments were dissolved without passage of the act, the tribal schools would cease to function.[46] Secondly, in the absence of a Principal Chief the allotment process would be interrupted.[47] Finally, it was feared that the dissolution of the tribes would cause the contingent grant of land made by the Congress immediately after

---

44. *Congressional Record,* January 18, 1906, p. 1242 (statement of Representative Curtis, the manager of the bill).

45. See Debo, *And Still The Waters Run,* p. 66.

46. See, e. g., *Congressional Record,* February 27, 1906, p. 3054.

47. See, e. g., *Congressional Record,* January 18, 1906, pp. 1240–1243.

the Treaty of 1866 to several railroad companies to vest in those companies by causing unallotted lands to become "public lands of the United States" upon the lapsing of tribal tenure.[48] As a result, on March 2, 1906 Congress passed a joint resolution, 34 Stat. 822, extending the life of the tribes until the allotment and property distribution process had been completed, or until otherwise provided by Congress. Shortly thereafter, on April 26, the act itself became law, and it contained a provision which superseded the joint resolution. Section 28, added to the act (over the strenuous objections of the Secretary of the Interior)[49] to avoid the problems posed by the dissolution of the tribes at that time, provided:

"Sec. 28. That the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek, and Seminole tribes or nations are hereby continued in full force and effect for all purposes authorized by law, until otherwise provided by law, but the tribal council or legislature in any of said tribes or nations shall not be in session for a longer period than thirty days in any one year: *Provided,* That no act, ordinance, or resolution (except resolutions of adjournment) of the tribal council or legislature of any of said tribes or nations shall be of any validity until approved by the President of the United States: *Provided further,* That no contract involving the payment or expenditure of any money or affecting any property belonging to any of said tribes or nations made by them or any of them or by any officer thereof, shall be of any validity until approved by the President of the United States."

The legal effect of this provision was unmistakable: Congress had declined to terminate the tribal existence or dissolve the tribal governments, despite all of its earlier intentions to do so, and despite the fact that its failure to do so rendered some of the other provisions of the Five Tribes Act ineffective. While it was anticipated that the tribes would eventually be dissolved, the net effect of the act was to expressly preserve and ratify the then-existing authority of the tribal governments, while reiterating the necessity for Presidential approval of tribal legislation imposed earlier. That section 28 had the effect of continuing indefinitely the existence of the tribe has been confirmed by each court that has examined the question. The Supreme Court has explicitly held that the Creek Nation still exists, *Board of County Commissioners v. Seber,* 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943), *reh. den.,* 319 U.S. 782, 63 S.Ct. 1162, 87 L.Ed. 1726 (1943), and has described the effect of the act in these terms:

"Congress at one time planned to terminate the existence of the Five Civilized Tribes in 1906, and the Act of 1906 was introduced into the House of Representatives with the object of preserving Indian interests after tribal dissolution. In the course of discussion, Congress determined to continue the tribal existence, and the Act was amended to that effect before passage."

*Creek Nation v. United States,* 318 U.S. 629, 638, 63 S.Ct. 784, 789, 87 L.Ed. 1046 (1943). Accord, *Creek Nation v. United States,* 78 Ct.Cl. 474, 493 (1933) ("While the ultimate dissolution of the tribal government was contemplated . . . its existence was continued, and thus the tribal government continued to exist and to function within the limits of its restricted jurisdiction and power during the period [through 1924]."); *Groundhog v. Keeler,* 442 F.2d 674 (C.A. 10, 1971).

Moreover, the Interior Department's later interpretations of this section as merely continuing in office the incumbent tribal officers while abolishing the Creek constitutional procedures for regularly filling those positions (and by logical implication therefore terminating the government itself when a sufficient number of those incumbents died or otherwise left office) is utterly untenable; such an interpretation con-

---

48. See, e. g., *Congressional Record,* February 26, 1906, pp. 2975–2977.

49. *Congressional Record,* February 26, 1906, pp. 2978–2979.

flicts with the legislative history and plain meaning of the section, see notes 41 and 42, *supra*. First, the March 2, 1906 joint resolution which initially extended the life of the tribal governments set as a termination date the completion of the distribution of the tribal estates. It would be illogical to assume (without any evidence whatever) that a provision which set a specific date for the total abolition of the tribal governments also *sub silentio* totally restructured those governments until that time; such a result would have been superfluous and would have served no discernible congressional purpose. And when even this termination date was removed from the extension section and replaced in section 28 of the final bill with provisions specifically allowing the functioning of that government, with certain specific limitations, the only reasonable conclusion to be reached is that—the final settlement of the tribal estates no longer appearing at all imminent—Congress concluded that the tribal governments should be continued into the indefinite future, with their functions limited by the proviso clauses of section 28. Secondly, the plain meaning of the words themselves point directly to that conclusion. It was the "present tribal governments" which were continued, not "incumbents" or "officers" or the like. This Court is also unaware of any instance in which the Congress has used the term "government" to mean particular individuals rather than the institution itself; given the connotations which have come to be associated with the term "government" in our political lexicon ("a government of laws, not of men"),[50] a contrary meaning can hardly be imputed to the Congress. Nor is this conclusion undermined by the use of the adjective "present": that term is used to contrast the effect of § 28 with the situation which would have been occasioned by the failure to repeal the termination date. Moreover, accepted principles of statutory construction lead to the same conclusion. When Congress, enacting a provision specifically dealing with the continuing powers of an ongoing governing institution, reverses a determination to dissolve that institution but places express and particularized limitations on its activities, it cannot be taken to have intended to accomplish the drastically different result represented by viewing the provision as one continuing in office the incumbent officeholders and precluding their replacement through the normal processes of the institution, when those processes are wholly unmentioned in the legislation, directly or indirectly. For all these reasons, the Court can only conclude that the intent and effect of § 28 was to permit the Creek government to continue to operate under the 1867 constitution as modified by the various statutory limitations. In particular, the government remained competent to deal with tribal affairs relating to the distribution of the tribal estates and with other matters not relating to the allotment process.

During the period immediately following the approval of the Five Tribes Act, the Interior Department behaved as though it had been successful in its efforts to prevent the enactment of § 28 and the Congressional changes made in its draft of § 6. The available evidence [51] clearly reveals a pattern of action on the part of the Department and its Bureau Of Indian Affairs designed to prevent any tribal resistance to the Department's methods of administering those Indian affairs delegated to it by Congress. This attitude, which can only be characterized as bureaucratic imperialism, manifested itself in deliberate attempts to frustrate, debilitate, and generally prevent from functioning the tribal governments expressly preserved by § 28 of the Act.

**50.** Original draft of Massachusetts Constitution, 1779; Article XXX, Massachusetts Bill Of Rights, 1780.

**51.** The primary source of evidence relevant to the events of this period, in addition to those sources already cited throughout this opinion, is the package of documents compiled by plaintiffs from the National Archives and the Federal Records Center in Suitland, Maryland, and submitted as exhibits to their Supplemental Memorandum In Support Of Motion For Summary Judgment, cited hereafter as "Pl.Mem. Exh. ___".

In August 1907 the Creek National Council met for its usual session and passed a resolution calling the regular quadrennial election for Principal Chief and Second Chief. The attorney for the Creek Nation, who had been approved by and had heretofore worked closely with the Department, suggested that the Department advise the Principal Chief (Pleasant Porter, a leader of the faction resigned to cooperation with the Department in its effort to terminate the existence of the tribes) that what Congress really intended in the Five Tribes Act was to continue the present incumbents in office. Mott, the attorney, who was of course aware of the substantial body of sentiment in the tribe opposed to capitulation to the policy of tribal extinction, warned Commissioner of Indian Affairs Francis Leupp that if elections were held the result would be "bickering, confusion, and dissatisfaction", which would be "a source of annoyance and inconvenience to the Government".[52] The Commissioner passed this advice on to the Secretary. Although the Commissioner apparently realized that the Creek National Council's resolution calling on the Principal Chief to call the election did not require approval of the department ("the resolution does not appear to require executive action"), he nevertheless suggests that the Chief be told that the Department "deems it inadvisable to take any action in the matter".[53] The question was apparently referred by the Secretary to Assistant Attorney General George Woodruff, who naturally interpreted the Act as not restricting the tribe's power to hold its usual elections. This opinion was expressed in a letter to Chief Porter. In response to this advice, one of Assistant Attorney General Woodruff's subordinates, an attorney named Pollock who had been detailed to serve in the Department's Indian Territory field office at Muskogee, immediately wrote a letter back to Woodruff.[54] In this letter he informed Woodruff that he himself had prepared an opinion holding that § 28 had continued "the form of tribal government and not the personnel" in response to inquiries from the other four tribes. He relates that the Secretary had approved the opinion, but that after the intervention of Senator Curtis that approval was withdrawn.[55] The other four tribes were therefore advised that the Department had refused to express an opinion.[56] Pollock goes on to suggest that Woodruff had been unaware of the posture taken earlier by the Department with respect to the other four tribes, and he then recommends that the letter to Chief Porter be recalled and that Porter be advised that "the Department cannot offer any suggestions in the premises, or, perhaps better still, that there seems to be no necessity for such an election." In response to Woodruff's referral of Pollock's letter, Commissioner of Indian Affairs Leupp concedes to Woodruff that § 28 does appear to continue tribal offices rather than officers, but suggests that the Department should at any rate recognize the incumbents and give them "*de facto* standing".[57] Events intervened however before the Department could act further when Chief Porter died suddenly a few days later. Seizing this opportunity to further frustrate the Creek constitutional government, Pollock immediately wired Leupp seeking prompt action. This wire vividly illustrates the true bases of the Department's actions during this period:

"Anticipating effect death Chief Porter may have upon Snake faction of [sic;

**52.** Pl.Mem.Exh. 1.

**53.** Pl.Mem.Exh. 2.

**54.** Pl.Mem.Exh. 3.

**55.** Senator Curtis was of course the leading proponent of the tribal dissolution policies, had authored the Curtis Act, and had opposed the addition of § 28 to the Five Tribes Act.

**56.** Taken as a whole, plaintiffs' exhibits strongly suggest the prevalence within the Department of a belief that if the law did not support the outcome sought by the Department, its objectives were nevertheless best served by *refusing to divulge its interpretation* and thereby maximizing the uncertainty with which tribal officials had to cope. Given the highly unsettled conditions of tribal affairs at the time, this expectation seems well-founded.

**57.** Pl.Mem.Exh. 4.

should be "or"] other recalcitrant Indians suggest importance department promptly appointing or recognizing his successor without specifically recognizing Creek law of succession. Same result would be accomplished by President appointing present second chief under section six Curtis act [sic; should be "Five Tribes Act"] thereby continuing present satisfactory administration which action we believe more expedient than a new election which would undoubtedly give strength to Snake movement."[58]

The Department accepted this advice and one day after the receipt of the telegram President Roosevelt appointed Moty Tiger, who as Second Chief of the Creek Nation would have succeeded to the office automatically under the Creek constitution, as Principal Chief.[59] Thus the Department successfully pre-empted the constitutional processes of the tribe for its own purposes. While the use of the appointment power under these circumstances was of questionable legality, given the congressional intent that section 6 be used at the discretion of the President when necessary to allow allotment deeds to be signed, it nevertheless marked the beginning of the Department's usurpation of the power over selection of the Principal Chief of the Creek Nation. No Principal Chief was again to take office without federal appointment until 1971.[60]

Despite the Department's various attempts to undermine the functioning of the Creek government in 1906 and 1907, the Department continued to recognize the authority of the National Council over Creek funds, and the necessity for its approval before the Department could expend such funds for purposes not explicitly authorized by statute. The National Council had held a session subsequent to the appointment of

Moty Tiger as Principal Chief, and in late November of 1907 the Department forwarded to the President for his approval (as required under § 28 of the Five Tribes Act) several pieces of legislation enacted by the National Council and approved by the Principal Chief. One of the Council's acts was "to provide for the continuation of the tribal government for the fiscal year ending December 4, 1908". The Secretary recommended the approval of the Council's appropriation of tribal funds for the operation of the government for the coming year.[61] A few days later the Secretary also recommended approval of the Council's appropriation of funds to be paid to the Presbyterian Board of Home Missions, which ran the Nuyaka Creek Tribal Boarding School under contract with the tribe. The Board had made a claim against the tribe with the Secretary, and it is noteworthy that the Department had declined to pay the claim out of tribal funds without an express appropriation of the National Council.[62] A few days later the Secretary recommended the approval of an act of the National Council abolishing the offices of National Auditor, Superintendent of Public Instruction, and Private Secretary to the Principal Chief, and creating the office of Executive Interpreter at an annual salary of $1500.[63] And in early 1908, the Commissioner to the Five Civilized Tribes requested permission from the Secretary to pay a Creek general fund warrant, which he states is "properly drawn in accordance with the act of the Creek Council approved by the President", indicating the Department's continued recognition of the Council's authority over Creek funds and affairs.[64] Nor did the Department seek to prevent the regular meeting of the Council in 1908. Subsequent to that meeting the Secretary recom-

---

**58.** Pl.Mem.Exh. 5. The Snake movement was the faction opposing tribal dissolution.

**59.** Pl.Mem.Exh. 6.

**60.** The Presidential authority conferred by § 6 of the Five Tribes Act was delegated to the Secretary of the Interior by Executive Order No. 10250, 16 Federal Register 5358 (June 5, 1951).

**61.** Pl.Mem.Exh. 7.

**62.** Pl.Mem.Exh. 8.

**63.** Pl.Mem.Exh. 9.

**64.** Pl.Mem.Exh. 10.

mended for Presidential approval an appropriation by the Council to pay the salary of the Executive Interpreter, the office created the previous year.[65]

During this period there was a continued clamor from the white citizens of Oklahoma, which had achieved statehood on November 16, 1907, for Congress to finally wind up the affairs of the Five Tribes so that the development of the state could proceed unimpaired by the continuing rights of the Indians. In the Appropriations Acts of 1908 and 1909 (35 Stat. 70, 91; 35 Stat. 781, 804) the Secretary was directed to complete the work begun by the Dawes Commission by July 1, 1909 and 1910 respectively; because so much remained to be done, allotments in Creek lands continued at least until 1917, see 39 Stat. 969, 986, and the equalization program was still unfinished in 1921, see 41 Stat. 408, 426. Besides pushing the Department to finish the division of Creek lands, the Congress in the 1909 Appropriations Act attempted to complete the Creek equalization program by directing the Secretary to make equalization payments from Creek funds. Congress set eight hundred dollars as the basic value of each allotment, and stipulated that the equalization payments made under this provision should be regarded as conclusive settlement of all Creek equalization claims. The provision also recognized the continuing authority of the Creek government in fiscal and tribal matters, making approval of the National Council a condition precedent for these conclusive equalization payments. 35 Stat. 781, 805.[66] This special session of the National Council was held for six days beginning on April 19, 1909. Responding to widespread dissatisfaction with the low value set by Congress as the basis for equalization of allotments, the Council rejected the Congressional scheme. An appropriation act passed by the Council to cover certain expenses of the session was nevertheless approved by the President.[67]

By late 1909 the Department had made considerable progress in demoralizing the Creek government. It had refused to permit elections to be held to fill vacancies on the Council, and had convinced Chief Moty Tiger that he could not call regular sessions of the Council without Department approval. Consistent with earlier and continuing BIA efforts to ensure that any Creek government be subservient to Bureau wishes, this marked the genesis of the strategy of dealing with the Principal Chief as though he were the sole repository of Creek governmental authority. As 1909 continued, however, the Council became concerned about the apparent subversion of its legal authority, and when Tiger failed to call the regular fall session of the Council, its members and other tribal leaders met in a rump session (which they termed the "Creek Convention") and passed a resolution demanding that the Council be convened. Tiger, who appears to have fulfilled the Department's expectation that he would be compliant with its wishes, simply referred the matter to the Commissioner to the Five Civilized Tribes.[68] The Commissioner ultimately forwarded his response to the Secretary of the Interior, and that response illustrates the Bureau's developing attitude: in response to part of the Convention's resolution asserting that the Council had a legal right to meet and to represent Creek citizens, the Commissioner stated that if "there is any matter, however, which should be brought to the attention of Congress or the Department, *it could be done by the Principal Chief* in a communication or personally and the same would receive prompt attention."[69] (emphasis added). After explaining why he considered it unnecessary for the Council to meet at that time, without commenting on the Creek

---

65. Pl.Mem.Exh. 12.

66. The provision also authorized the Secretary to specify the duration of the special session of the Council which would be necessary to ratify the equalization scheme by limiting compensation to that length of time.

67. Pl.Mem.Exh. 13.

68. Pl.Mem.Exh. 14.

69. *Ibid.*

claim that the Council was legally entitled to convene, the Commissioner recommended to the Secretary that he be authorized "to advise the Principal Chief that at any time when he deems it necessary he can submit a request for authority giving specific reasons therefor and the same will receive careful consideration." This situation continued for several years, with the Creek leaders and Council members calling for meetings of the Council and the Bureau assuming the authority for denying permission for such meetings to be held.[70] In each case the leadership pointed to the continuing problems with and resistance to the allotment program, as well as the unsettled equalization issue, and asserted the right of the Council to deal with these problems (as well as others), and in each case the Bureau took the attitude that a meeting was unnecessary and that the Council need not deal with these matters.

One of the principal complaints made by the rump Creek Convention of 1909 was that "funds belonging to the Creek Nation are being disbursed without the knowledge or consent of the Creek Council, as provided for in the Agreement."[71] The Bureau's response was to rationalize its expenditures as implicitly authorized by the 1901 agreement and the Secretary's disbursement responsibility. This response typifies the attitude that had angered the tribe, a belief in the Bureau that it could charge off to tribal funds without the consent of the tribe any expenditure related in any way to the administration of Creek affairs. The Convention's complaint also reflects dissatisfaction with the actual administration of Creek financial transactions, which since the Curtis Act had been so disorganized that it was impossible to distinguish between increments to and payments from tribal versus federal funds.[72] When the Indian Territory first secured representation in Congress, a Cherokee citizen, Robert L. Owen, then a member of the U.S. Senate, managed to win passage for a resolution directing the Secretary of the Interior to prepare a statement of his administration of the Five Tribes' finances for the ten year period following the Curtis Act. This report was published in 1909, and it confirmed the accusations of the Indians that their funds were not being handled properly.[73] Indeed, the Creeks were ultimately awarded more than $144,000 as a result of mishandling and illegal expenditures of their funds.[74] As a result of the obvious abuse by the Secretary of his control over tribal disbursements, the Oklahoma delegation in 1912 was able to secure the passage of a provision in the appropriation bill for that year restricting the Secretary's authority to make disbursements from tribal funds, except for certain limited purposes, without Congressional authorization. 37 Stat. 518, 531. This restriction was re-enacted in each appropriations bill thereafter, until 1922, when it was made permanent.

■ By 1914, Congress was again ready to deal with the issue of equalization of Creek allotments. In the appropriation act of that year, 38 Stat. 582, 598, 601, Congress again set the value of allotments at $800, and again called for a special session of the Creek National Council.[75] While the record is unclear as to what action the Council took with respect to the equalization provisions in the 1914 act, it appears not to have ratified the $800 value, holding out instead for a value of $1040 (the value set by the Creek Agreement of 1901) and in 1918 Congress directed that all but $150,000 of Creek Tribal funds be paid out per capita to members of the tribe for equalization purposes. 40 Stat. 561, 580. The 1914 session of the National Council also passed several other acts, one of which made it illegal for a member of the Council to consume alcoholic

---

**70.** Pl.Mem.Exh. 15, 16, 17.

**71.** Pl.Mem.Exh. 14.

**72.** See Debo, *And Still The Waters Run*, pp. 81–85, 265.

**73.** *Ibid.*

**74.** *Creek Nation v. United States,* 78 Ct.Cl. 474 (1933).

**75.** As was the case in 1909, the act also directed the Secretary to fix the length of the session and the reimbursement to be paid to the members attending the meeting.

beverages. This act was transmitted by the Commissioner to the Five Tribes for his superiors, but was not transmitted to the President for approval apparently because of an expectation within the Department that the Council would not meet again.[76] The Council did meet again, however, in 1916. Although the Bureau had not authorized a meeting, Chief Tiger did call the Council into session in December of that year. One of the Council's principal actions at that session was the passage of a resolution requiring Chief Tiger to appoint a delegation to accompany him to Washington to consult with the Department.[77] The resolution was transmitted to the Secretary's office, which responded that the resolution would not be submitted to the President for approval and that the session was unauthorized. In this response the Department stated that it had the authority to prohibit Council meetings altogether by virtue of the provisions in the 1909 appropriation act, see note 59, *supra,* which allowed the Secretary to limit reimbursement of Council members for expenses for the 1909 special session to a fixed number of days. This contention, which was apparently never raised either before this letter or subsequently for at least fifteen years, is wholly without legal foundation. The provision cited was clearly intended to deal only with the 1909 special session, and the Department's assertion is belied by the legislative history of the 1909 act.[78] Moreover, even had the provision given the Secretary the general power to determine whether or not to reimburse Council members for other meetings, such a power would in no way have permitted him to forbid the Council to meet at all. This response can only be viewed therefore as a further example of the Department's failure to make a consci-

entious effort to adhere to the provisions of law in dealing with the Five Tribes, a failure reflecting the belief that because the tribes were unable to force the Department to recognize their legal rights the Department could therefore proceed as it considered best. This pragmatic approach succeeded in at least one respect: there is no further record of any meeting of the Creek National Council after 1916.

■ Despite the efforts of the Department, however, the Creeks refused to abandon their tribal government and political life. When it became apparent that the National Council could no longer have new members elected or convene in regular session, the "Creek Convention" which had begun meeting around 1909 gained increased vitality and began to assume the former role of the Council. Because the Creek tribal town structure remained strong,[79] the Convention was able to provide a forum for the discussion and resolution of Creek affairs quite similar to that originally provided by the Council. In 1921 it was known as the "Creek Mass Meeting", and by 1923 as the "Creek General Convention".[80] A majority of the tribal towns were apparently represented in its meetings, some by National Council members and others by other newly-elected representatives of the towns (because no new election of National Council members had been permitted, many were either old or dead by that time). The Convention continued to meet regularly and function for decades thereafter, and can effectively be regarded as the successor in function to the National Council.

■ The surviving members of the National Council itself continued throughout the 1920's to request permission for the

**76.** Pl.Mem.Exh. 19 notes that "no further action [on the act] necessary as last meeting of Creek National Council to be held."

**77.** Pl.Mem.Exh. 22.

**78.** Both the House and the Senate reports on the appropriation bills in 1909 state that the affairs of the Five Tribes cannot be wound up in the immediate future, and that the committee intends to address matters at issue with

respect to the tribes in a bill later that session. The bill was therefore not intended to make any such major changes with respect to the tribes. S.Rept.No.1036, 60th Cong., 2d Sess., at 8; H.Rept.No.1897, 60th Cong., 2d Sess.

**79.** See Debo, *And Still The Waters Run,* p. 373; Opler, *supra.*

**80.** Defendant's Trial Exhibit 8 (hereafter Def. Tr.Exh.).

Council to meet.[81] Those requests were denied for the usual reasons, and the Department also added that the restrictions on the Secretary's disbursements, originally enacted in 1912 and made permanent subsequently, prevented his authorization of any Council session or disbursements for reimbursement of expenses of members. The irony of this suggestion is profound; here the Secretary twists a limitation enacted by Congress for the benefit of the tribes and as a result of his own gross mismanagement of tribal funds into a restriction instead on the tribes themselves. The irony is magnified by the Secretary's own reversal of position a few years later when, in defense of a suit by the Creeks to recover moneys illegally expended, he asserted his authority to make any disbursements related to tribal government. Indeed, the Court of Claims held in that suit that none of those restrictions limited use of tribal funds for expenses of the tribal governments, including those of council members. *Creek Nation v. United States,* 78 Ct.Cl. 474, 493–494. In short, the Department's assertion that no legal authority existed for a meeting of the Creek National Council was as unfounded in 1928 as it had been twenty years earlier.

The Creek Convention met regularly during the early 1930's, and on October 26, 1933 it passed a resolution calling upon the Commissioner of Indian Affairs to permit an election for the officers of Principal Chief and Second Chief. The new Commissioner, John Collier, was considerably more sympathetic than his predecessors to Indian desires for self-determination and granted permission for the election to be held.[82] The Convention met in June of 1934 and adopted rules and procedures for the elec-

tion.[83] Forty-two tribal towns participated in the election, and the winner, Roly Canard, was appointed Principal Chief by the President. During the subsequent four years (the constitutional period of office of a Principal Chief), the Convention and Chief functioned much as the Council and Chief had earlier, even forwarding to the Department resolutions for approval.[84]

The assumption of office of the Roosevelt administration marked a temporary shift in federal Indian policy. Realizing that the prior allotment and assimilation policy had been a disaster, Secretary Ickes and Commissioner Collier secured the passage in 1934 of the Wheeler-Howard Act, 48 Stat. 984. The Supreme Court has described the Act as reflecting "a change in policy, the theory of which is that Indians can better meet the problems of modern life through corporate, group, or tribal action, rather than as assimilated individuals." *Board of County Commissioners v. Seber, supra,* 318 U.S. at 716, n. 20, 63 S.Ct. at 926. The central provisions of the Act ended allotments in severalty, allowed the re-establishment of communal lands, and permitted the organization of tribal governments with control over tribal funds. As a result of the efforts of the Oklahoma delegation, however, these provisions were inapplicable to the Five Civilized Tribes.[85] In 1936 Congress passed the Oklahoma Indian Welfare Act, 49 Stat. 1967, permitting Oklahoma Indians to take advantage of most of the provisions of the 1934 Wheeler-Howard Act. The Creek Nation has not—before the present time—attempted to organize under the provisions of the 1936 Act,[86] and it is not at issue in this case.[87]

81. Pl.Mem.Exh. 23, 24.

82. Pl.Mem.Exh. 27.

83. Pl.Mem.Exh. 29.

84. Pl.Mem.Exh. 31, 32.

85. Debo, *And Still The Waters Run,* pp. 368–370.

86. Appendix to Defendants' Cross Motion For Summary Judgment, Document 9 (hereinafter,

Def.App.Doc. ___). This Appendix was filed, at the Court's request, on August 6, 1976.

87. The parties agree that the only relevance of the Act to the issues herein is that it provides an independent basis under which the Creek Nation could have organized subsequent to its passage; no contention is made that the Act had any effect on the status of the Creek National Government under existing law, nor does the Court find any such effect.

At the end of Chief Canard's customary four-year term, permission was again sought and obtained for an election to fill the office of Principal Chief. At the election of January 3, 1939, Alex Noon was elected to the post; he was subsequently appointed by the President.[88] It appears from Secretary Ickes' letter to the President recommending the appointment that the Department had at this time begun to recognize the Creek Convention as the legislative body of the tribe; the Convention at this time was functioning much as the Council had earlier. On January 27, 1944 the Creek General Convention met and, with twenty-four tribal towns represented by delegates, adopted a "Constitution and By-Laws".[89] This "constitution", which had been years in drafting by Convention committees,[90] essentially formalized the procedures which had evolved in the Convention for conducting the tribe's business. It made the Convention and the Principal Chief together the supreme governing authority of the tribe, with the delegates to the convention to be elected from the forty-four original tribal towns. A Business Committee was created to conduct the business of the tribe at the time when the Convention was not in session, subject to the Convention's direction. The Principal Chief was given the role of representing the tribe in any matters in which he was given authority to do so by law, by lawful regulations of the Interior Department, or by direction of the Convention. The constitution also provided that it was not to be construed in any way to alter, abridge, or otherwise jeopardize the rights and privileges of any member of the tribe. The constitution also changed the name of the supreme governing body (the former Convention and the Chief together) to the Creek Indian Council. The body was thereafter known more or less interchangeably as either the Creek Indian Council or as the Creek General Convention.

The 1944 Constitution, which in general represented a continuation of the Creek pattern of self-government that had evolved over the course of more than a century, was forwarded to the Department of the Interior by the Superintendent of the Five Civilized Tribes.[91] He noted that the tribe was not attempting to organize under the Oklahoma Indian Welfare Act, but was rather creating a structure for conducting tribal affairs. The Superintendent also forwarded the Council's request for an appropriation of Creek funds for the expenses of the tribal government. In reply, the office of the Commissioner of Indian Affairs stated that no funds would be approved for a tribal organization which was not approved under the provisions of the Act, and pointed out that the new constitution could not be approved under the Act because the new governing document excluded the freedmen from membership in the tribe without having given them an opportunity to vote on that provision.[92] The Bureau therefore did not act to make the funds available, and explicitly refused to give any official sanction to the new constitution. The Creeks however did not regard Departmental approval as such necessary for the adoption of the constitution, and therefore continued to operate the Creek Indian Council and Creek government pursuant to its provisions, without seeking further action by the Department. In 1945, the tribe again requested that tribal funds be made available for the operation of the Council,[93] and the Bureau consented with the caveat that its consent not be construed as approval of the constitution.[94] By the following year, the Bureau was prepared to state that "the Creek General Convention . . . has been recognized by this Office as having authority to speak for the tribe" and that the Convention "has acted as the official

---

88. Pl.Mem.Exh. 33, 34, 35.

89. Def.Tr.Exh. 10.

90. Def.Tr.Exh. 9.

91. Def.Tr.Exh. 10.

92. Def.App.Doc. 13.

93. Def.App.Doc. 20.

94. Def.App.Doc. 21.

governing body of the Tribe" since 1924.[95] The Creek General Convention or Indian Council continued to function under the format and procedures of the 1944 constitution through 1951, and during that period was recognized by the Department as the competent legislative authority of the tribe.

The vigor and liveliness of Creek political life, evident throughout the tribe's post-Revolutionary War history, did not abate with the Department's successful destruction of the Creek National Council during the first two decades of the twentieth century. As noted earlier, there were continual demands that the Council be convened and incessant debate about the unsettled state of tribal affairs. During the following three decades the venerable Creek tradition of political debate and factionalism was not cowed by adversity, as significant segments of the tribe rejected the policies of the Interior Department, the legitimacy of the General Convention, and the handling of tribal affairs by the Principal Chiefs and the Convention.[96] One faction in fact continued to demand that the federal government honor its treaty and statutory obligations to the tribe, particularly with regard to tribal funds. Indeed, as late as 1946, Joseph Bruner, who had been elected to the old House of Kings in the National Council more than forty years earlier, wrote to the Secretary demanding that the Department cease its expenditure of tribal funds for the expenses of the General Convention, citing the original Creek Agreement and the Five Tribes Act.[97] In response, the Department stated that it recognized the General Convention as the tribe's official governing body, despite the feelings of the tribal members associated with the Bruner faction.[98] The response also cites the current appropriation act of the Department as authority for the expenditure of tribal funds for the Convention's expenses, under a provision allowing such expenditures for the expenses of tribal governing bodies, but fails to cite any legal authority for regarding the Convention as the Creeks' governing body. Ironically, this response reflects the same Bureau of Indian Affairs practice—deciding what policy was to be and only then "justifying" it by reference to the governing statutes—that was used earlier in the century to prevent a Creek legislature from functioning.

The factionalism that had been brewing throughout the 1940's came to a head after the election in 1950 of John Davis as Principal Chief, and his appointment to that position by the Secretary of the Interior. Davis was appointed on January 2, 1951, approximately six months early, due to the death of Chief Roly Canard shortly after Davis' election in October of 1950.[99] Immediately upon taking office, Chief Davis declared that the credentials of the members of the newly-elected session of the Creek Indian Council or General Convention were improper or irregular, and thereafter refused to recognize that body as authoritative in any respect.[100] Davis repudiated the 1944 constitution,[101] and immediately appointed members of the various tribal towns as a new Creek Indian Council.[102] As might be expected, Chief Davis' actions caused a furor in the tribe. The rival (elected) Council refused to accept his actions as legitimate, and continued to meet throughout Davis' first four-year term as Principal Chief.[103] The Bureau of Indian Affairs, however, finding Davis and his Council to its liking, backed his actions, advising the many members of the tribe who attempted to have his actions nullified by the Bureau that since under section 6 of the Five Tribes Act the

95. Def.App.Doc. 15.

96. See, e. g., Def.Tr.Exh. 11; Def.App.Docs. 17, 19.

97. Def.App.Doc. 14.

98. Def.App.Doc. 15.

99. Def.App.Docs. 23, 24; Def.Tr.Exh. 11.

100. Def.App.Docs. 29, 31–36, 39, 40; Def.Tr. Exh. 11.

101. Def.App.Doc. 29.

102. Def.App.Docs. 29, 31–36, 39, 40; Def.Tr. Exh. 11.

103. Def.App.Docs. 36–38, 41, 42.

Principal Chief was the sole embodiment of tribal authority, Davis had the power to abolish the elective Creek Indian Council—which the Bureau regarded as merely advisory anyway—and replace it with an appointed Council to advise him.[104] When members of the elected Council filed suit in the Okfuskee County District Court to set aside Chief Davis' actions, the court sustained the Bureau's position and refused to interfere with the functioning of Davis' Council,[105] ruling instead that the elected Council was without authority over tribal affairs and that the Council appointed by Chief Davis had been recognized by the Bureau and was the official Creek Council. This appointive council was then designated as the Creek Tribal Council, and the Bureau continued to deal with it instead of with the Creek Indian Council. The Creek Indian Council nevertheless continued to hold its regular sessions for the four-year terms of its members (ending in 1955), and apparently considered itself the representative primarily of the full-blood and restricted Creeks.[106] Although the Court is without substantial information on this point, it appears that the Creek Indian Council as such ceased meeting at some point in the late 1950's. Since the appointment of the Creek Tribal Council by Chief Davis in the early 1950's, it appears that all the subsequent Councils have been appointed by the Principal Chiefs and have served in a progressively more advisory than legislative capacity with respect to the conduct of tribal affairs by the Principal Chief and the Bureau.[107]

Despite the avalanche of criticism of Chief Davis' handling of tribal affairs, the Bureau continued to be pleased with his administration, and refused to undermine his position.[108] The Bureau, which by the end of Davis' term in 1955 had once again reversed its policy and now favored termination of Indian tribes, had however begun to examine the possibility that the office of Principal Chief should be terminated or should be occupied on a part-time basis, and was also considering the possibility of eliminating any further elections of the Chiefs.[109] As a result of this study and the prevailing philosophy of the Bureau at that time, the Bureau subsequently decided to appoint the Principal Chiefs without the benefit of any election by the tribe. Until 1970, therefore, the affairs of the Creeks were administered without even a token of democracy, and the Principal Chief was treated by the Bureau as being the sole embodiment of the Creek governmental authority.[110] As is evident from the foregoing, the influence and control of the Bureau over the various incarnations of the Creek national government between 1920 and 1970 was exercised wholly without the benefit of any specific Congressional mandate. As such, it constitutes no support whatever for the defendants' position in this suit, and indeed the history of the period demonstrates the continued vitality and resilience of Creek political life and institutions, fatally undermining defendants' claim that the Creek political infra-structure is incapable of discharging the functions plaintiffs assert should be discharged by a Creek legislative institution.

The fourth and final piece of legislation critical to the resolution of plaintiffs' claims was enacted in 1970. The Act of October 22, 1970, 84 Stat. 1091, came at a time when federal Indian policy had once again reversed itself, this time in favor of tribal self-government. The Act provides:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, notwithstanding any other provisions of law, the principal chiefs of the Cherokee, Choctaw, Creek, and Seminole Tribes of Oklahoma and the governor of the Chick-

---

104. Def.App.Docs. 35, 36, 39, 40, 44; Def.Tr. Exh. 11.

105. Def.App.Docs. 36, 31, 32.

106. Def.App.Docs. 37, 38.

107. Cf.S.Rep't. 91–805, *infra* at 4.

108. Def.App.Docs. 39, 40.

109. Def.App.Docs. 35, 39, 40, 42, 43, 44.

110. See, S.Rep't. 91–805, infra at 3–4.

asaw Tribe of Oklahoma shall be popularly selected by the respective tribes in accordance with procedures established by the officially recognized tribal spokesman and or governing entity. Such established procedures shall be subject to approval by the Secretary of the Interior.

"*Sec.* 2. The Secretary of the Interior or his representative is hereby authorized to assist, upon request, any of such officially recognized tribal spokesman and/or governing entity in the development and implementation of such procedures.

"*Sec.* 3. A principal officer selected pursuant to section 1 of this Act shall be duly recognized as the principal chief, or in the case of the Chickasaw Tribe, the governor, of that tribe.

"*Sec.* 4. Any principal officer currently holding office at the date of enactment of this Act shall continue to serve for a period not to exceed twelve months or until expiration of his most recent appointment, whichever is shorter, unless an earlier vacancy arises from resignation, disability, or death of the incumbent, in which case the office of principal chief or governor may be filled at the earliest possible date in accordance with section 1 of this Act.

"*Sec.* 5. Nothing in this Act shall prevent any such incumbent referred to in section 4 of this Act from being elected as a principal chief or governor."

The defendants concede that the Act makes no mention of the powers of the Principal Chiefs, and that its provisions do not explicitly alter the existing legal situation. The Department does argue, however, that the legislative history of the Act "shows that Congress was made aware of the fact that affairs of the Five Civilized Tribes were being administered by Principal Chiefs and a Governor", and that Congress therefore intended to abolish the underlying legal authority for a constitutional government and to ratify the present form of Creek tribal government.

The defendants' argument is logically and legally without foundation. First, it seems obvious that a bill whose purpose was to increase the autonomy and self-government of the tribe would hardly have done so by *sub silentio* dismantling an existing form of government which provided more self-government than the scheme allegedly to be substituted. Such an intent cannot be presumed without a clear indication in the legislative history. In construing the statute and its legislative history, two cardinal principles must be observed. First, in order to ratify an originally erroneous administrative interpretation of earlier legislation, Congress must give express consideration or make specific reference to the question at issue in the later legislation. See, *Kristensen v. McGrath,* 86 U.S.App. D.C. 48, 179 F.2d 796, 803–804 (1949), *aff'd,* 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173. There must be some clear indication that Congress intended to alter an existing legal situation. Secondly, implied repeal is not a favored tenet of construction, and the court must try to give effect to earlier legislation which has not been expressly repealed. *Ex parte Webb,* 225 U.S. 663, 32 S.Ct. 769, 56 L.Ed. 1248 (1912); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Moreover, this general presumption against implied repeal applies with special force where the established legal rights of Indians under federal legislation or treaties is involved. *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1972); *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899); see also note 112, *infra; United States v. United States Fidelity and Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The fact that Congress may have been "made aware of the fact that affairs of the Five Civilized Tribes were being administered by Principal Chiefs and a Governor", defendants' sole statutory interpretation argument, is therefore legally insufficient in the circumstances of this case to establish a repeal of the tribes' right to constitutional self-government in favor of a one-man elected monarchy.

Even beyond the impact of these canons of construction however is the legislative history itself, which clearly shows that Congress was unaware of any controversy or question with regard to the legal form of Creek tribal government, and in fact intended to deal only with the narrow issue of the method of selection of the Principal Chief. That legislative history shows moreover that the fundamental congressional judgment underlying the Act was a desire to facilitate tribal self-determination to the maximum extent possible. Of particular significance in this regard is the congressional decision to amend the bill, removing the original requirement that the Principal Chiefs or Governors be "elected", and replacing it with the term "popularly selected". As the House Committee explained, the members felt it "would be unwise to impose on the tribes by statute a mandatory requirement that the principal officers must be popularly elected. The choice of the method of selecting the principal officers should be left to the tribes themselves." H.Rep't. No. 91–1499, 91st Cong., 2d Sess., U.S.Code Cong. & Admin. News 1970, pp. 4332, 4333. It seems obvious that the congressional attitude reflected by this explanation is wholly incompatible with the intention to actually limit the tribes' existing legal authority to determine their form of government which the defendants would have the Court imply into the Act. The purpose of the bill was rather, as the committee report puts it, simply "to permit the members of the Five Civilized Tribes of Oklahoma to select their own principal chiefs or governor." *Id.*

Finally, the House committee's own description of the legal situation to which the bill was addressed precludes any inference that it was intended to terminate the existence of or deal in any way with the legislative branch of the tribal governments. The committee's report described the situation as follows:

"The act of April 26, 1906 (34 Stat. 137), was intended to provide for a final disposition of the affairs of the Five Civilized Tribes. While the act severely limited the authorities of the principal officers,[111] it recognized their continuing authority to dispose of tribal property. Section 6 of the act authorizes the President of the United States to remove these officers should they refuse to perform their duties under the act. The President is also authorized to fill any vacancy arising from removal, disability, or death by the appointment of a citizen by blood of the tribe. The President delegated his authority to the Secretary of the Interior in Executive Order No. 10250, dated June 5, 1951." U.S.Code Cong. & Admin.News 1970, p. 4332.

The Departmental report accompanying the committee report refers to the chiefs' functions in disposing of tribal property as "certain ministerial functions". It is clear therefore that the committee was only addressing itself to the impact of the 1906 Five Tribes Act upon the authority of the principal chiefs. The ministerial duties referred to are of course the signing and conveyance of allotment deeds. This partial description of the effect of the 1906 act does not even touch upon the effect of section 28 of that act on the role of the tribal legislatures, which were expressly preserved by that section. And since section 6 of the Five Tribes Act had no connection with the authority of the tribal legislatures, the House committee's reference to that section and to the act's impact on the role of the principal chiefs cannot be taken as dealing with the issue of the authority of tribal legislatures at all. For these reasons, the Court holds that the 1970 Act had no effect on the legal authority of the legislative branch of the Creek national government, and that under federal and Creek law the Creek national legislature retains the authority to make the initial decision con-

---

111. It appears to the Court that the term "principal officer" is used throughout the bill and report instead of simply "principal chief" because the chief of the Chickasaw tribe is known as "governor". The phrase "principal officers" has no relation whatever to the legislative branch of the tribal governments.

trolling the expenditure of Creek funds for tribal purposes.

## IV.  CONCLUSION

The plaintiffs' claim in this case has been that the federal defendants, through their policies and practices, have acted illegally in recognizing the Principal Chief as the sole embodiment of the government in the Creek Nation, and that according to existing federal and Creek law tribal funds may not be disbursed by the federal defendants for general tribal purposes without the approval of the Creek national legislature. The federal defendants' responsive argument has been that either the Creek national government has, by Congressional action, been rendered incompetent to handle the tribe's financial decision-making, or in the alternative that Congress in enacting a 1970 law stripping the Interior Department of any power to appoint the Principal Chief of the tribe somehow impliedly abolished the entire federal and tribal legal scheme theretofore defining the form and scope of the tribal government.

The defendants' first argument has withstood neither logical, historical, nor legal analysis.  If the Creek government had been rendered incapable of allocating its own funds, then the Interior Department would have been unable to implement or justify the policy which has in fact most recently been in force, i. e. recognition of· the Principal Chief as the embodiment of Creek government responsible for and capable of making those decisions.  By its very policies the Department demonstrates that a functioning and competent Creek government in fact continues to exist; the historical record demonstrates moreover that a competent legislative-executive government has persisted throughout more than half a century of the most adverse conditions imaginable.  Indeed, plaintiffs do not challenge the Department's recognition that a functioning Creek government continues to exist, but rather contend that by law the Department may not confine its recognition of that government solely to one of its constituent institutions, the Principal Chief. Therefore the Department's argument that the Creek government has been rendered incompetent to handle Creek affairs is logically irreconcilable with its actual policies and practices, and must fall on that ground alone.  However even had the defendants argued—as they have not in this Court, despite the use of such arguments by the Department over the course of the preceding seventy years—that Congress had somehow replaced the Creek constitutional form of government with an imposed government consisting of the Principal Chief, their position would have been legally and historically unsupportable.  For such an argument to prevail, the Congress would have had to both terminate the authority of the Creek National Council to initially determine the tribal purposes for which Creek funds would be spent and also to invest the Principal Chief with that authority.  Congress undoubtedly has the power to do any of those things, or to terminate the existence of the tribe entirely.  However, because such an abolition of the Creek constitutional government would have been tantamount to a total repudiation of the tribe's right, solemnly guaranteed to it by treaty after treaty, to determine its own form of organization and government—and indeed a final repudiation of tribal sovereignty itself—familiar principles of statutory construction in general and of interpretation of federal Indian law in particular mandate that such congressional action be clear and explicit; [112] where the statutes and their legislative histories fail to clearly establish such an intent, the Court may not supply one by judicial interpretation.  As the Supreme Court recently noted, courts "are not

---

112. See, e. g., *United States v. New England Coal and Coke Co.,* 318 F.2d 138, 142–143 (C.A.1, 1963); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Worcester v. Georgia,* 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483 (1833); *Carpenter v. Shaw,* 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930); *Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res.,* 231 F.2d 89 (C.A. 8, 1956); *Board of County Commissioners v. Seber,* 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943); *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916).

obligated in ambiguous circumstances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship". *Bryan v. Itasca County,* 426 U.S. 373, at 388, n. 14, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976), citing with approval *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (C.A. 9, 1975); the Court also goes on to indicate that present federal policy has returned to an intention to strengthen tribal self-government. *Id.*

This is not, in any event, a case of statutory ambiguity. As this Court's examination of the relevant statutes and history makes clear, not only did Congress not terminate the sovereign status of the tribe, it expressly reaffirmed that status. Nothing in the Acts of 1898, 1901, and 1906 or any other legislation abolished the Creek National Council or stripped it of its power to determine the uses to which tribal funds are to be put, except with respect to certain mandatory expenditures and uses connected with the allotment and equalization program, and with the abolition of the tribe's territorial jurisdiction in the process of organizing the Indian Territory for statehood. These limitations have long since become irrelevant to tribal affairs, leaving the elected legislature created by the 1867 constitution (and effectively re-established at least twice thereafter) the authoritative body for initial allocation of tribal funds. While Congress has limited the overall duration of legislative sessions in any one year, and has explicitly specified the procedures through which such legislative actions become final, it has equally explicitly recognized and preserved the authority of the national legislature and the basic form of government established by the 1867 constitution.

A necessary corollary to that conclusion is that Congress has not replaced that form of government with a government consisting exclusively of the Principal Chief. This conclusion is not only a logical necessity, but is also the only conclusion possible after an examination of the relevant statutes and history. None of those statutes had either the intent or the effect of investing the Principal Chief with the authority to determine the purpose to which tribal funds should be put; that he has now come to perform that function results wholly from the Interior Department-Bureau of Indian Affairs' determined use of its raw power over the tribe to bring about that result. And finally, for the reasons stated in the Court's earlier discussion of the issue, the Act of 1970 carried with it no congressional intent to abolish the existing legal situation and to replace it with government by Principal Chief alone.

In conclusion, plaintiffs have asked the Court to vindicate certain legal rights guaranteed them by solemn promises of the United States, given over the course of a century and a half. While the credibility of these promises has been gravely undermined by various federal actions, culminating in the abolition of the tribe's territorial sovereignty, the essence of those promises, that the tribe has the right to determine its own destiny, remains binding upon the United States, and federal policy in fact now recognizes self-determination as the guiding principle of Indian relations. Plaintiffs' claim is, at bottom, simply an assertion of their right to democratic self-government, a concept not wholly alien to American political thought. Plaintiffs have demonstrated a clear legal entitlement to have these rights vindicated, and the Court cannot honorably do otherwise.

## V. RELIEF

Like most other aspects of this case, the fashioning of appropriate equitable relief is a complex matter. The premise from which the court must begin is that the basic legal framework governing the management of Creek tribal affairs, financial and otherwise, is the Creek Constitution of 1867. As the foregoing discussion makes clear, under the 1867 Constitution and the relevant federal law, the expenditures of tribal funds which the federal defendants now make and permit to be made under the

authority of the Principal Chief may not be legally made without the assent of a Creek national legislature. There is, however, no such legislature in existence today, nor has there been any such legislature as contemplated by the 1867 constitution since about 1916.[113] As a result, the Court must devise some mechanism for the restoration of legality to the administrative and disbursement operations of the federal defendants, which necessarily requires the re-establishment of a constitutional Creek government including a national legislature. At the same time, it would be highly anomalous in a case in which the underlying claim is one of self-determination for the Court to vindicate that right by simply mandating the creation of some particular sort of institution or government. It follows then that the re-creation of the constitutional Creek government should be accomplished by the Creeks themselves.

The question then is precisely how all this is to be arranged. The Court has been kept advised by counsel of the continuing effort on the part of a committee appointed by Chief Cox to draft a proposed constitution for the tribe.[114] This committee was appointed by the Chief in 1973 with a mandate to draft a constitution to be submitted to the federal government for approval. The committee's plan of action was approved by the advisory Council, and during the summer of 1973 the committee held four "hearings" at which any Creek citizen could sign up to make suggestions as to how the drafting should proceed. The committee subsequently, from June 1974 to August 1975, carried out the formulation, development, and drafting of a proposed constitution, which was then approved by the advisory Council. The draft was then submitted to the Bureau of Indian Affairs for its comments, and the Chief subsequently appointed a new committee to incorporate the Bureau's recommendations into the draft. This was done between November of 1975 and May of this year. On May 24, 1976 the proposed constitution was submitted to the Bureau for approval under the Oklahoma Indian Welfare Act, after the advisory Council accepted the changes made in response to the Bureau's recommendations.

The proposed constitution developed under Chief Cox's auspices would establish a Creek national government fairly similar to that created by the 1867 constitution. It would consist of an executive branch headed by a Principal Chief, a national legislature, and a judiciary. The proposed constitution does however make three changes in the form of government established under the 1867 constitution which must be regarded as fundamental. First, it fails to provide for an office of Second Chief, thereby altering the traditional line of succession to the office of Principal Chief. Second, the Creek National Council to be created by the proposed scheme is unicameral, unlike the traditional form embodied in the 1867 constitution consisting of a House of Kings and a House of Warriors. Finally, and probably most fundamentally, election to the National Council would be from geographic districts, rather than from tribal towns as was the case throughout Creek history. This particular change alters the basic nature of the Creek Nation; under the prior system, it was a confederacy of tribal towns, each of which elected its representatives to the national legislature. Under the new proposal, the role of the tribal towns in Creek national political life would entirely lose its former significance.

■ It is not properly the role of the Court to express any view as to the merits of this proposed constitution or of the changes it would make in the legal structure of Creek national government; that is a matter for determination by the Creeks themselves. Moreover, there is no doubt that the tribe as a whole is legally entitled to develop a new constitution to be adopted either as an exercise of the tribe's inherent sovereignty or pursuant to the provisions of

---

**113.** The present "Creek National Council" is neither elected pursuant to nor functions according to the 1867 constitution. It is essen-
tially an advisory council evolved from Chief Davis' Tribal Council of the 1950's.

**114.** See Def.App.Docs. 1–7.

the Oklahoma Indian Welfare Act. However under the 1867 constitution, which is the prevailing law governing the current organization of the tribe, any such action would have to be approved by the duly constituted national legislature, which does not now exist. The submission of the current proposed constitution to the Bureau is therefore not equivalent to the submission of such a document by the tribe itself, and is not cognizable by the Bureau as properly activating the machinery of the 1936 law. The Bureau is therefore enjoined from conducting further proceedings to approve that document in its present posture.

The fact that the proposed constitution is not yet a legal submission of the Creek Nation does not, however, mean that it must be abandoned entirely. Indeed, it is apparent to the Court that the document does represent a concensus of the members of the tribe on at least a certain basic level, *viz,* that the tribe should have a tripartite constitutional government along lines evolved from Creek tradition and history and capable of effectively meeting the challenges of tribal affairs in years to come. As noted earlier, in such circumstances it would be paradoxical for the Court to frustrate such an evident step towards self-determination by fashioning an order which ignored it entirely. Nevertheless, the Court's responsibility is to ensure that its order results in compliance with the law, and in the present context this means that whatever fundamental institutional arrangements are finally settled upon be arrived at through procedures as fully compatible with the 1867 constitution as possible, given the circumstances. To do otherwise and allow the present document to be approved without further action would constitute a repudiation of the Court's conclusion that the Principal Chief, under whose auspices this proposal was drafted, is not the sole embodiment of Creek tribal authority, and would further constitute a ratification of the illegal policies of the Depart-

ment of the Interior which brought about the current situation.

The problem of course is that there is no duly constituted national legislature to amend and/or submit the proposed constitution, and it would obviously make little sense to order the creation of one for the purpose of working on a document which itself provides for the creation of a national legislature. In any event, in order to do so the Court would have to resolve a large portion of those questions already determined to be within the sole province of the tribe for decision. One option in these circumstances would be for the Court to direct the election of a constitutional convention to consider and amend this document or draft a new one. Yet this would be so similar to ordering the convening of a national council that the same problems discussed above in that regard are again applicable. Moreover, this would effectively repudiate the proposed constitution—a course already rejected as inappropriate—since it would be pointless to convene such a body without giving it a mandate broad enough to permit full scale rewriting of the proposal (this criticism is equally applicable to an order convening a national council). Another possibility is to rely on the fiction that the up-or-down, yes-or-no final ratification procedure provided for by the proposed constitution affords a meaningful opportunity for members of the tribe to participate in its development. Given the fundamental nature of the changes proposed, this fiction is however little more than that, and it therefore cannot be regarded as an effective or functional substitute for consideration of the document by a legal national legislature.[115] Nor did the hearings held by the drafting committee provide such an opportunity, since they were held before these basic decisions were made and before the changes had been embodied in a draft. Finally, the advisory Council now in existence is so unlike the constitutional National Council in form, function, and role in tribal

---

**115.** Ratification of the final document, once approved by the Bureau, will still of course be necessary.

affairs that its approval cannot be regarded as an effective substitute for consideration and approval by a legally constituted national legislature, even were the advisory Council in fact independent of the Principal Chief.

One reasonable option does however remain. It seems generally agreed in democratic political thought that legislators derive their legitimacy and authority ultimately from those electing them or creating the political body in which they serve. In the present circumstances, where the legislature itself is irremediably unavailable, consent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves. In the present circumstances, where there is broad concensus on the general framework of the institutional arrangements to be implemented, with certain well-defined basic questions remaining to be authoritatively settled, a feasible and appropriate approach would be to consult the members of the tribe directly, by means of a referendum on each of the three basic questions posed by the draft constitution. This is the approach adopted by the Court.

A few technical problems with this procedure remain. First is the question of who will be eligible to vote in these referenda. Two kinds of elections are contemplated by the 1867 constitution: One for Principal Chief and the other for the National Council. As noted in Part II of this opinion, qualifications for voting in elections for delegates to the National Council were not specified by the 1867 constitution, but were determined by each tribal town for itself. The only provisions for a national election comparable to the referenda prescribed herein are for the office of Principal Chief, for which the document does call for universal adult male suffrage. The qualifications for voting in elections for Principal Chief have however subsequently been altered by operation of federal law; pursuant to the 1970 Act and the regulations promulgated thereunder, voting for Principal Chief is now by universal adult suffrage. It appears to the Court therefore that the eligibility criteria most compatible with the 1867 constitution, and therefore to be used in the referenda, are those currently used for electors for the office of Principal Chief.

Secondly, provision must be made for the incorporation of the results of these referenda into the draft constitution and for any redrafting that may be appropriate in light of those results. Whatever mechanism is adopted to do this should also be chartered to take whatever other steps may prove necessary for the effective implementation of this order. Given the existence of significant differences of opinion within the tribe with respect to the issues posed by the three questions to be voted on, any such mechanism must also be structured to allow for the expression and reconciliation of these differences in the implementation of this order.

To achieve these goals, the Court adopts a device familiar to other situations in which such disputes must be resolved. The implementation of this order shall be conducted by a five-member commission, two members of which shall be nominated from among the members of the tribe by the Principal Chief, and two members of which shall be selected from among the members of the tribe by plaintiffs. The fifth member, who shall serve as chairperson, shall be selected by unanimous vote of the other four members, and need not necessarily be a member of the tribe. This commission shall be responsible for carrying out, with assistance from the Bureau of Indian Affairs, an educational program consisting at least of literature and public discussions held throughout the Creek nation, designed to make the vote a meaningful and fully informed one. The commission shall prescribe that voting on each of the three questions shall be in the alternative (i. e. which of the two alternatives shall be adopted?), and will also have the responsibility for approving the precise wording of the three questions to be determined by the vote. The commission may also, at its discretion, conduct whatever proceedings it considers appropriate during the implementation of this order, under rules to be adopt-

ed by it. All actions of the commission shall be by majority vote, and all votes shall be recorded. The commission may, in its discretion, provide that the vote on whether representation on the National Council is to be on the basis of tribal towns or geographically shall precede the vote on whether the Council is to be unicameral or bicameral. After the voting, which shall be by secret ballot, on all three questions has been completed, the commission shall incorporate the results of those votes into the provisions of the May 24, 1976 draft constitution and shall make any other changes in that draft which it considers appropriate as a direct result of any changes made by the incorporation of the results of the referenda. Upon completion of its work, the commission shall forward the resulting final draft to the Bureau of Indian Affairs for approval. The commission shall then have no further functions under this order, unless the Bureau objects to any provisions in the final draft, in which case the commission may make responsive changes if it deems them appropriate, and if they are not of a fundamental nature such as the three questions to be determined in the referenda. Throughout the commission's implementation of this order, the Bureau of Indian Affairs shall facilitate and support its work in every way.

The Court believes that the mechanism described herein can and will function with a minimum of difficulty and with considerable effectiveness. If the parties to this lawsuit, the members of the tribe, and the members of the commission can work together in a spirit of harmony and cooperation, the Court has no doubt that the political resourcefulness and resiliency exhibited for so long by the Creek Nation will finally enable the tribe to remove the uncertainty that has for so long dominated its political life and recapture the cherished self-determination that is its legal and moral right. The United States has given its word; the promise must be kept.

Accordingly, it is by the Court this 1st day of September, 1976

ORDERED:

1) That as of September 1, 1978 the federal defendants shall not expend or permit the expenditure of any funds under their custody or control which belong to or are owed to the Creek Nation without the consent of a legally constituted Creek national legislature, as described herein; and

2) That the Department of the Interior, the Bureau of Indian Affairs, and their employees, agents, and attorneys shall not approve or take any steps to approve any proposed constitution for the Creek Nation unless and until such a proposed constitution is submitted to the Department or the Bureau by the commission described in Part V of this Opinion and Order, except that the Department and Bureau shall take all steps necessary to ensure the creation, organization, and effective functioning of such commission, as described herein. In carrying out this order with respect to the commission, the Bureau and the Department shall facilitate in every way the functioning of and cooperate fully with such commission, but shall have no authority over the operations or decisions of the commission. As part of said facilitation, the Bureau and the Department shall provide whatever material, human, and organizational resources are necessary for the commission to carry out its functions effectively, but no such resources provided shall be charged to tribal funds; and

3) That plaintiffs' motion for summary judgment be, and hereby is, granted; and

4) The Court shall retain jurisdiction of this case until its order has been fully and finally implemented.

IT IS SO ORDERED.